1
2
3
4          UNITED STATES DISTRICT COURT
5          NORTHERN DISTRICT OF CALIFORNIA
6
7   SARA L KRUEGER,                    Case No. 21-cv-06145-HSG
8              Plaintiff,
                                       **ORDER DENYING PETITION FOR**
9      v.                              **WRIT OF HABEAS CORPUS;**
                                       **DENYING CERTIFICATE OF**
10  MIKE PALLARES,                     **APPEALABILITY**
11             Defendant.
12
13          Petitioner, a state prisoner incarcerated at the Central California Women's Facility, filed

14  this *pro se* action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the

15  validity of a conviction obtained against her in state court.  ECF No. 1.  Her petition alleges four

16  claims: (1) *Batson* error; (2) insufficient evidence of first-degree murder; (3) insufficient evidence

17  of fatal child assault; and (4) erroneous admission of evidence.  Respondent has filed an answer

18  and a memorandum of points and authorities in support of his answer.  ECF Nos. 7-9.  Petitioner

19  has not filed a traverse.  The Court has carefully considered the arguments in the petition and the

20  memorandum of points and authorities.  For the reasons set forth below, the petition is denied and

21  a certificate of appealability will not issue.

22                              **PROCEDURAL HISTORY**

23          In 2014, petitioner and her codefendant Ryan Scott Warner were charged by criminal

24  complaint with murder and assault on a child causing death.  ECF No. 8-1 at 34-35.  An amended

25  complaint was filed in June 2015 adding a special allegation of murder by torture.  *Id.* at 196-97.

26  The district attorney later filed an information in November 2015 charging petitioner and Warner

27  with murder, assault on a child causing death, and a special allegation that the murder was

28  intentional and involved the infliction of torture.  *Id.* at 223-25.

United States District Court
Northern District of California

United States District Court
Northern District of California

In 2017, a Napa County jury convicted petitioner of first-degree murder (count one) and assault on a child causing death (count two).  ECF No. 8-5 at 22, 24.  The jury also found true the special circumstance allegation that the murder involved torture.  *Id.* at 23.  The court sentenced petitioner to life without parole on count one and 25 years to life on count two, stayed pursuant to California Penal Code section 654.  *Id.* at 72-73.

On direct review, the California Court of Appeal reversed the special circumstance finding of torture based on insufficient evidence of petitioner's intent to kill, remanded for resentencing, and affirmed the judgment in all other respects.  *People v. Krueger*, No. A152087, 2021 WL 194189, at *1 (Cal. Ct. App. Jan. 20, 2021).  On April 14, 2021, the California Supreme Court summarily denied review.  ECF No. 9-41 at 2.

On June 17, 2021, petitioner was resentenced on remand to 25 years to life.  ECF No. 9-42 at 2.

In August 2021, petitioner filed this federal petition.

## BACKGROUND

The following relevant factual background is taken from the January 20, 2021 opinion of the California Court of Appeal.[1]

### B. Prosecution Case

1. *February 1, 2014: Kayleigh's Body is Found*
Warner's friend Antonio Valdez testified that for about two days, starting on the afternoon of January 30, 2014, he received texts and calls from Warner, who claimed to need his help for an unspecified emergency. At about 12:30 on the morning of February 1, Valdez and his brother drove to Krueger's apartment complex and met with Krueger and Warner. Warner said that Kayleigh had drunk poison or bleach and was dead. Valdez did not want to be involved. He became angry and told them to call the police. Warner said they were about to discuss doing that. Valdez left, and later contacted Warner, asking

---

[1] The Court has independently reviewed the record as required by AEDPA.  *Nasby v. McDaniel*, 853 F.3d 1049, 1055 (9th Cir. 2017).  Based on the Court's independent review, the Court finds that it can reasonably conclude that the state court's summary of facts is supported by the record and that this summary is therefore entitled to a presumption of correctness, *Taylor v. Maddox*, 366 F.3d 992, 999–1000 (9th Cir. 2004), *overruled on other grounds by Murray v. Schriro*, 745 F.3d 984, 999–1000 (9th Cir. 2014), unless otherwise indicated in this order.

whether he had called the police. Warner again told him that they were going to discuss doing that. After a few hours, Valdez realized that Warner was not going to call the police, so he called them himself.

In the early afternoon of February 1, Napa Police Officer Robert Chambers went to Krueger's apartment in response to a telephone tip. He obtained a key, entered the apartment, which was filled with a smoky haze, and discovered Kayleigh's body in her bed under blankets. Only her face was visible; it looked bruised, and there was blood coming from her nostrils. It appeared that Kayleigh had been dead for some time, and her skin was "ice-cold."

The forensic specialist who processed the crime scene testified that the apartment was dark, dirty, disorganized, and smelled strongly of marijuana. The curtains and shades were closed, and extra fabric around the windows had been taped to the wall. There were three latex gloves on the floor. In the kitchen there were dirty dishes in the sink, empty food containers, and containers of partly-eaten food. The freezer itself was empty of food, and its shelving unit had been removed. A later search of the apartment revealed paraphernalia related to the use of marijuana and methamphetamine.

The coroner's investigator who examined Kayleigh's body in the apartment testified that there were bruises all over the body and that the pattern of lividity was inconsistent with the body's position. If Kayleigh had been in that position at the time of death, the lividity would have been on the back of her body; instead, it was on the right side in the front.[6]

> 6. The investigator explained that once the heart stops beating, gravity takes the blood to the bottom of the body, and that Kayleigh's body was found on its back with the legs bent slightly to the right, with one arm across the abdomen and the other by her side.

An attempt by police to "ping" Krueger's cell phone to locate her that day was unsuccessful, indicating that her phone was turned off.

2. *Before June 2013: Krueger's Relationships with Warner and with Jason Slusher*
Krueger testified that she and Warner met during the summer of 2005, when she was 15 and he was 17; she fell in love with him; they used methamphetamine together; and they had a brief relationship until Warner moved away at the end of the summer.

When Krueger was 16, she met Jason Slusher (Jason)[7]

> 7. We use first names to refer to individuals who share the last name "Slusher."

at a "drug house," where people got together to use drugs. They became intimate, and when Krueger was 17 she moved in with Jason and his parents and lived with them for a couple of years. Later, Jason and Krueger got their own apartment, where they were living when their daughter Kayleigh was born in May 2010. Jason's mother

testified that both Krueger and Jason had short tempers. They would argue often, with violence on both sides. One time Krueger hit Jason in the head with a two-by-four, and Jason responded by slamming the car door on Krueger's arm. Krueger's friend Allen Epperson, who spent time with Krueger and Jason, saw them arguing and recalled a time when Jason threw something at Krueger, who then pulled a knife out at him.

In 2012, Krueger and Kayleigh moved to a new apartment in the same complex where she and Jason had lived. The apartment measured 585 square feet, and had two bedrooms, one for Krueger and one for Kayleigh. At some point Jason moved back in with them, but Jason and Krueger broke up, and in June 2013 Krueger called the police because Jason was stalking and harassing her. Jason was eventually arrested and sentenced to prison for violating parole.

Krueger and Warner had reconnected on Facebook in the summer of 2011. She and Jason were sometimes seeing each other and sometimes not; she would text with Warner when she and Jason were "off," but not when she and Jason were back together.

Friends, family members, and neighbors testified that for the first three years of Kayleigh's life, she was a happy and healthy child, and Krueger was attentive to her. Krueger took her to the doctor regularly and facilitated her relationships with members of Jason's family, as well as her own.

3. *Summer 2013: Warner Moves in with Krueger and Kayleigh*
In the summer of 2013, Justin Kent stayed in Krueger's apartment a few nights a week. He testified that initially Krueger was attentive to Kayleigh and there was no drug use in the apartment. But about a month after Kent started staying with Krueger, Warner moved in and things began to change. Soon Warner, Kent and Krueger were using methamphetamine and marijuana in Krueger's bedroom while Kayleigh watched TV or played in another room. Warner and Krueger were in a romantic relationship, and Kent believed that Krueger had more affection for Warner than he had for her—Warner did not label them as a couple. Kent moved out after a disagreement with Warner.

4. *Fall 2013 through January 2014: Changes in Krueger and Kayleigh*
Robin Slusher, Kayleigh's paternal grandmother, testified that she was very much involved in Kayleigh's life until about Halloween of 2013, when a new pattern developed: Robin would ask to see Kayleigh and Krueger would not allow it saying that Kayleigh was sick, or Krueger would cancel a planned get-together, saying Kayleigh was sick. Robin attempted to see Kayleigh at Thanksgiving, but Krueger told her Kayleigh was sick.

In mid-December 2013, Krueger told Robin that Kayleigh was sick and asked Robin to bring Pedialyte and popsicles to the apartment, which Robin did, but Krueger did not permit Robin to enter the apartment or see Kayleigh. Robin saw Kayleigh at Robin's house for about 45 minutes on Christmas day, and noticed that she had dark circles under her eyes.

In mid-January 2014, Robin took Krueger and Kayleigh to a movie.[8]

> 8. In the remainder of this opinion, dates are in 2014 unless otherwise stated.

Robin noticed that Kayleigh had a bruise that covered almost her entire cheek. Krueger told her that Kayleigh had bumped heads with Krueger's friend, and that although the friend had been crying, Kayleigh said, "Don't cry. It's not a big deal." After the movie, Kayleigh "burst into tears" because she didn't want the movie to be over. When they got in the car for Robin to drive them home, Kayleigh said she wanted to go to her grandparents' house, and she cried when Krueger said no.

During the third week of January, Krueger told Robin that Kayleigh was sick, and Robin went to the apartment with food to settle Kayleigh's stomach. Once again, Krueger did not allow Robin to enter the apartment or see Kayleigh. On January 29, Robin asked the police to conduct a welfare check on Kayleigh. On January 31, Robin texted Krueger and asked if Kayleigh could join her for a family lunch. Krueger responded by text that they were going to Santa Cruz for the weekend.

Jennifer Slusher, Kayleigh's aunt, testified that she had spent a great deal of time with Robin, Kayleigh, and her own children from the time Kayleigh was born until about three months before her death. During that three-month period Jennifer tried several times to arrange for Kayleigh to get together with her children, but Krueger would not allow Kayleigh to visit.

Sophia Grech, Krueger's sister, often visited the apartment that Krueger shared with Kayleigh. She testified that Krueger had been "an amazing mother," who "would play with [Kayleigh] and make sure she was taken care of." But things changed after Warner started living there. Krueger seemed unhappy. Once, Krueger's finger or hand was broken, and Krueger told her she had slammed it in a door. It began to seem to Grech that Krueger was paying attention to Warner, but not to Kayleigh, who would be in a different room of the house. Weeks before Kayleigh's death, Krueger admitted to Grech that she was using methamphetamine.

Around Christmas 2013, Grech noticed a bruise about 3 inches in diameter on Kayleigh's lower back. When she asked Krueger about it, Krueger said that Warner had told her that they were playing with Kayleigh's bike and that she fell. About a month before Kayleigh died, Kayleigh became quieter. And in that month, Grech spent less time at the apartment, but about two or three weeks before Kayleigh died, Grech walked into Krueger's bedroom and saw her using methamphetamine. The last time Grech saw Kayleigh was about a week before Kayleigh died; Kayleigh was coloring at the kitchen table with no one else in the room. Grech tried to call Krueger several times in December 2013 and January 2014, but failed to reach her: when Grech called, Warner would answer the phone and hang up on her when she said "hello."

Krueger's friend Amanda Patterson would get together daily with Krueger and Kayleigh. Before Warner came to live with Krueger, neither Krueger nor Patterson was using drugs, though they had used them in the past. After Warner moved in with Krueger, the women went back to using drugs, sometimes with Warner and sometimes without him. At first, they used methamphetamine just on the weekend, but then on an almost daily basis. Patterson told an investigator that when Krueger came down from methamphetamine, she would get irritable, upset, or angry.

Patterson testified that after Warner moved in, Krueger "stepped back as a mom" and let Warner do "fatherly things," including taking Kayleigh to the bathroom, making meals for her, and feeding her. One time when Patterson and Krueger were present, Kayleigh was sitting in her highchair, said she was full, and then threw up. Warner responded by telling Kayleigh she needed to stay in the chair until she was done eating. Warner would discipline Kayleigh by lecturing her and putting her in time outs that lasted from a couple of minutes to 20 or 30 minutes.

Patterson observed that after Warner moved in, Kayleigh cried more, became scared to go to the bathroom, and started having a hard time moving her bowels.[9]

> 9. Kent had testified that when he started staying at the apartment, Krueger was toilet training Kayleigh. The training was going well when Warner first arrived, but Warner made her sit on the toilet until she relieved herself, sometimes as long as half an hour. Sometimes Kayleigh asked for her mother; even though Krueger was present, Warner would go into the bathroom and tell Kayleigh she had to use the toilet before she could get up.

A few weeks before Kayleigh died, Patterson noticed bruises on Kayleigh, including a bruise on her chin and neck. Warner told her that Kayleigh fell and hit her chin in the bathtub; Krueger told her that Kayleigh had tripped over the clothes hamper in the bathroom. Starting about a month before Kayleigh died, Patterson noticed that Kayleigh was often sick and throwing up and looked tired.

Krueger described her relationship with Warner to Patterson as complicated, as though "they were together but not together," even though Krueger cared for Warner. Patterson thought Krueger might have been infatuated with Warner, but based on his behavior, she did not think he was infatuated with Krueger. Patterson was not aware of Warner ever hitting Krueger but observed him verbally abusing her. Patterson characterized Warner's behavior as "controlling." Warner frightened Patterson once when he and Kent woke her in the middle of the night, with Warner sitting on the end of her bed saying he could tell her things that would scare her.

Several of Krueger's neighbors in the apartment complex testified that after Warner moved into Krueger's apartment, they saw Kayleigh playing outside less often than they had before; when they did see her, she was often alone, while in the past Krueger had been with her.

Neighbors also testified that Kayleigh had bruises in the last months of her life, and that she looked pale, acted subdued, and had a black eye in the weeks before her body was found.

Neighbors offered other testimony as well. Breann Abernathy, a medical assistant who lived in the apartment next to Krueger's at the time of Kayleigh's death, testified that after Warner moved in with Krueger, she heard yelling, arguments, and screaming from Krueger's apartment. Abernathy also recalled Krueger going to the doctor for whom Abernathy worked to get treatment for a hand injury, and telling Abernathy that she hurt her hand when she and Warner were moving furniture at 3:00 in the morning and her hand was slammed against the wall. One night about a week before Kayleigh died, Abernathy was awakened by what she thought was something being thrown against the wall in Krueger's apartment.

Mandi Farr testified that at about 3:30 one morning, Farr and her boyfriend were awakened by Krueger and Warner knocking on the door, asking the boyfriend to drive Krueger to the emergency room and Farr to watch Kayleigh. Krueger appeared to be in pain; she said her fingers had been slammed in a door. Farr understood that Krueger and Warner were in an argument and Warner slammed her hand in the door. When Warner later came to pick Kayleigh up, Kayleigh held on to Farr's neck, saying "no, no, no, no." When Kayleigh realized that Krueger was there with Warner, she let Warner pick her up and they left.

Alejandra Fermin Cisneros lived in an apartment next door to Krueger's; the apartments shared common bedroom walls, and Kayleigh's bedroom shared a wall with Fermin Cisneros's. When Krueger and Kayleigh first moved in, Fermin Cisneros would hear them laughing and playing in Kayleigh's bedroom. After Warner moved in, she no longer heard laughter and playing through the wall. About three times in the two weeks before Kayleigh's death, Fermin Cisneros was awakened in the middle of the night by the slamming of a door in Krueger's apartment. She testified that after she heard the door slam she would hear Krueger or Warner screaming at Kayleigh to be quiet. She "would hear [Krueger] hitting her and then coming out – getting outside of the room, because you can clearly hear that they would slam the doors. And after that, [Warner] I believe would come in and he would say, 'Didn't you hear your mom to tell you to be quiet,' or 'shut up.' I can't remember exactly what word he used. And—well, that's what I would hear, that they would hit her, yes." She did not recall each occasion in detail, but she recalled that one night Krueger yelled at Kayleigh to be quiet or she would hit her, she heard Krueger hitting Kayleigh, and she heard Warner yelling at Kayleigh. After Krueger and Warner left the room, she would hear Kayleigh breathing heavily. On two of the occasions, Fermin Cisneros knocked on the wall and said Kayleigh's name. She thought Kayleigh knocked back the first time.

5. *Police Visits to Krueger's Apartment in Late January*

On January 27 at about 9:40 a.m., Officer Chambers responded to a report of a loud disturbance in Krueger's apartment. Krueger answered the door, upset and crying; before Chambers could explain why he was there, she asked whether it was illegal to argue. Chambers

explained that someone had reported a loud argument in her apartment, and he wanted to make sure everyone was okay. Chambers was inside the apartment for about five minutes, and while he was there, he saw Kayleigh, who sat on Krueger's lap. Chambers observed Kayleigh to seem happy, and she asked him about his uniform. Krueger said she and Warner had been arguing over money and that she had slammed a door a couple of times. She said she did not need police assistance, and Chambers did not notice signs of domestic violence. Warner was in the apartment when Chambers arrived; while Chambers was talking with Krueger, Warner was outside talking with an officer who had accompanied Chambers.

On January 29, at about 8:30 p.m., Napa Police Officer Garrett Wade went to Krueger's apartment to conduct a welfare check for Kayleigh that had been requested by Robin, Kayleigh's grandmother, who had expressed concern that Kayleigh wasn't being adequately fed and that Krueger was using drugs. When Krueger answered the door, Wade explained he was there for a welfare check and asked to come in. Krueger initially said no and closed the door so that just her head and upper body were outside the door. Wade then asked Krueger to call Kayleigh to the door, which Krueger did. Krueger lifted Kayleigh, who was wearing pajamas, to her hip and stepped outside the door; the only part of Kayleigh's body that Wade could see was her face. He noticed two small bruises on the left side of Kayleigh's chin and asked Krueger about them. She said Kayleigh had fallen off her bike. While Wade was talking with Krueger he saw Allen Epperson, whom he knew, and Warner walk from the back of the apartment. Wade eventually walked through the apartment, scanning it as he went, and did not observe any drugs or contraband or anything that seemed to pose an immediate danger to a child. He saw food on the counter in the kitchen, which appeared moderately clean.

Wade then spent about 15 minutes with Krueger and Warner, evaluating them for signs of intoxication and interviewing them as they sat on the living room couch a couple of feet apart from each other. Krueger did not appear to be intoxicated. Warner, who showed some signs of intoxication, admitted that he had taken one of Krueger's pain pills and smoked marijuana.[10]

> 10. Krueger testified that she had constant pain in her hand for which she had been prescribed Percocet and Tramadol, which she took "occasionally."

Warner identified himself to Wade as "Ryan Howard"; Krueger said nothing about his true name. After about 10 minutes focusing on Warner, Wade turned his attention to Krueger. Kayleigh said nothing to Wade during the visit; he thought she said something to Krueger, but he could not hear what it was. A few minutes later, Kayleigh, who was still in Krueger's arms, vomited. Krueger stood up to leave the room, saying she was going to take care of Kayleigh because she had the flu, and asked Wade to leave, which he did.

### 6. *Epperson's Testimony*

Epperson had known Krueger for about 10 years. They would use methamphetamine and marijuana together until Krueger got pregnant, at which point she stopped using except for occasionally smoking

United States District Court
Northern District of California

marijuana. Epperson regarded Krueger as a sister and Kayleigh as his niece. He had been in and out of jail for the past several years and would spend time with Krueger when he was out.

Epperson first met Warner when he went to Krueger's apartment on January 9 or 10; he hadn't seen Krueger in about a year before that. He testified the apartment seemed messed up and dirty, and recalled that he had told the police he had never seen Kayleigh looking so pale and not well taken care of, and that Kayleigh told him, "I'm so happy to see you. I don't like nobody in this house here no more." Krueger and Warner looked "strung out, like they'd been using," and Krueger was acting "on edge, moody" as if she was high. She had lost weight since he saw her last.

Epperson next went to Krueger's apartment on January 29, the day of the police welfare check. He recalled that he had told the police that Kayleigh "looked like shit" that day. When he asked about Kayleigh's bruise, Krueger said Kayleigh had fallen down and bumped her head. At some point he went to the refrigerator to get something to eat, but it seemed empty.

On January 29, Epperson, Krueger and Warner smoked methamphetamine in the bedroom with the door closed while Kayleigh was in the living room watching cartoons. Before the police came, Krueger had gone to check on Kayleigh, and found her in the bathroom drinking something that might have had tobacco in it. Krueger started yelling, asking Warner where her cell phone was so she could call poison control, and then went into the kitchen slamming things. When Epperson went out into the living room, Krueger was trying to get Kayleigh to drink water and throw up; Krueger said that poison control told her to do that. Epperson was under the impression she had called poison control.

Epperson left the apartment after the police welfare check that evening. At some point before he left, Krueger gave him a Percocet. The next day, January 30, at about 1:50 p.m. he texted Krueger asking for more Percocet but got no response. He texted her again on January 31 at about 10:30 a.m. and got a response saying, "Hey, my bad, we bounced out of town for a min. After what happened the other night we just had to get away."

During one of Epperson's January 2014 visits to the apartment, Warner admitted that he was with Krueger just to get a place to live.

### 7. *Flight and Arrest*
Sometime after 9:00 a.m. on February 1, a neighbor saw Krueger and Warner leaving Krueger's apartment with luggage.[11]

> 11. Warner was carrying a red and black "hand pack." The bag was never found.

Around noon that day, Antonio Vasquez was at a Home Depot waiting for work and noticed Krueger asking for a ride. Warner was with her, but about 20 feet away. Krueger, who did not seem upset, asked Vasquez for a ride to the bus station in Vallejo, telling him that she had a children's video game she would give him in exchange for

the ride. He agreed to give her a ride, and she called to Warner. They had a suitcase-like bag with them. The drive took 20-25 minutes, during which no one spoke. Neither Krueger nor Warner appeared to be upset.

On the morning of February 2, Silvia Melendez was sitting in the lobby of a restaurant when she looked at a news story on her cell phone about the police looking for two suspects in connection with the death of a little girl. The story included pictures of Krueger and Warner. A woman and man then entered the restaurant. Melendez noticed that the man looked like the person in the photo, and started looking at the story again, at which point she saw that the woman, who had sat down next to her, was looking down at Melendez's cell phone. The woman then got up quickly and spoke with the man, and the two left immediately.

Later that morning, BART Police Officer Boutain received an alert describing two people who were wanted for murder by the Napa police department and who were last seen at a restaurant across from the station where Boutain was located. Boutain canvassed the BART station, saw Krueger and Warner, and asked if they needed help. Krueger started crying and said she needed to talk to the Napa police about something bad that had happened there. Krueger and Warner were then arrested.

Warner had his cell phone in his pocket when he was arrested. In the phone case there was a receipt from Target for the purchase of ice cream on January 31 at about 3:15 p.m. Krueger's cell phone was in her purse, as were state benefits cards for Krueger and Kayleigh.

Blood drawn from Krueger and Warner on the afternoon of February 2 tested negative for the presence of methamphetamine and positive for marijuana. A toxicologist testified that methamphetamine is on average undetectable three to four days after ingestion.

### 8. *Krueger's Interview with Detective Hess*

Andrew Hess, the lead detective on the investigation of Kayleigh's death, interviewed Krueger in two parts on February 2, after she was arrested and taken back to Napa.[12]

> 12. As part of the prosecution case, the jury was shown a videotape of the first part of the interview and given transcripts to follow along. As part of the cross-examination of Krueger, who testified in her own defense, the jury was shown videotapes of both parts of the interview and given transcripts. We summarize both parts here.

The interview began with Hess asking Krueger what had happened to Kayleigh. Krueger said that on the night of January 29, Kayleigh started vomiting after she drank from a measuring cup. The cup had contained two squirts of Windex and dirty water that Warner said he had used to clean a tobacco pipe; Krueger could see tobacco in the sink, and Kayleigh told Krueger she poured out what was in the cup and then filled it up with water because she was thirsty.[13]

13. Krueger told police that she had put the measuring cup on the stove. The parties stipulated that a measuring cup found in the kitchen of Krueger's apartment bore Warner's fingerprint, and DNA consistent with Kayleigh and Warner.

At the time, Krueger, Warner, and Epperson were at the apartment. Krueger thought Kayleigh had swallowed tobacco, which made her sick. Kayleigh vomited quite a few times, over a period of hours.

Asked why she didn't call the paramedics when Kayleigh was vomiting, Krueger said that it was because she and Warner had been using drugs. At the time Kayleigh drank the liquid, Krueger was "coming back" to her senses after using methamphetamine, and wanted to call poison control, but Warner told her that Kayleigh was throwing up, which is what she needed to do. They thought she had thrown up whatever she had drunk.

When Kayleigh stopped throwing up, she was put to bed, and Krueger went to bed as well. When Krueger awoke, on the afternoon of Thursday, January 30, she found Kayleigh on the bathroom floor and thought she was sleeping. Kayleigh had apparently taken off her zip-up pajamas, which she could do by herself. Krueger went to wake her up, but Kayleigh was stiff.

Krueger told Hess she wanted to call the police when she found Kayleigh's body, but Warner said the police wouldn't believe them. So Krueger told Warner to leave, and that she would call the police. Even though she had a phone and could have called, she didn't because she was scared. Krueger said that after she found Kayleigh, she held her and then put her in her bed wrapped in blankets.

For the rest of Thursday afternoon and Friday, she would go in and out of Kayleigh's room. Warner said he didn't want to go to jail for something he didn't do, and Krueger told him to leave and run so she could call the police. Warner spent time on Friday making phone calls.

On Friday night, two people came to the house, including one of Warner's friends, who Krueger knew to be a high-ranking gang member and who terrified her, and the friend's brother. Warner had asked them to get Warner and Krueger out of there. Warner and Krueger told the men what happened, and the friend said they should have called the police. Warner took the men into Kayleigh's room, while Krueger remained in the kitchen. The men told Warner and Krueger to call the police, which they did not do.

At about 1:00 or 2:00 on Saturday morning, after the men left, Krueger said she was going to call the police, and Warner put Kayleigh's body in the freezer to preserve evidence. Krueger said she may have passed out, and that Kayleigh's body was in the freezer for about three hours before she took it out and put it back in bed with blankets, a pillow and a toy.

Krueger and Warner then fell asleep for a couple of hours, and when they awoke they decided they had to leave. At about 9:30 or 10:00

11

a.m. on Saturday, they left the apartment and walked to a nearby Game Stop, where they tried to sell a PlayStation 3. Later they sold it to someone at Home Depot to get a ride to Vallejo, where they got on a bus, which they took to a BART station. They then went to San Francisco and walked around, and they went to a church to pray and have the pastor help them call the police, but the church was closed, so they went to the airport, where they stayed the night. On Sunday morning, they took BART back to the station where they had boarded and went to a restaurant because Warner was hungry. She turned her phone on just one time.

Krueger told Hess she hadn't used drugs in days, except for some marijuana. She said she had a problem with methamphetamine long before she had Kayleigh, but she stopped using when she learned she was pregnant and didn't use again until Warner came into her life in 2013, at which point they were using almost every day or every other day. Kayleigh would watch a movie when they used.

When asked about bruising on Kayleigh that neighbors had noted about a week before, Krueger said Kayleigh had fallen off her bike, and had just a little bruise. Krueger also said that at one point Kayleigh had a black eye; Warner told her that he and Kayleigh had bumped heads when Kayleigh jumped up to give him a hug, resulting in a black eye for Kayleigh and a swollen eyebrow for him. Krueger was not present when it happened but had no reason not to believe it. Also, Kayleigh had the flu about two weeks before she died.

Krueger said she and Warner had been together since August and although her own relationship with Warner was "complicated," he was good to Kayleigh, and the two of them were close. He helped with Kayleigh's toilet training and taught her letters and numbers. Kayleigh was smart, friendly and outgoing, and used to ask Krueger if Warner could be her dad. In response to Hess's remark that people told him Kayleigh's demeanor had changed since Warner was around, Krueger told Hess that Kayleigh missed her father and was often nervous but perked up around Warner. Krueger said she never saw Warner put his hands on Kayleigh, and Kayleigh never said anything to Krueger about Warner doing anything to her.

In the second part of the interview, Hess asked who had given Kayleigh baths, and whether Krueger had noticed bruises when she bathed her. Krueger said that both she and Warner had given Kayleigh baths. Kayleigh bruised easily, and she sometimes noticed bruises, mostly on Kayleigh's knees or elbows. Krueger said that sometimes Warner would be alone with Kayleigh, for example when she went to the store.

Asked how they put Kayleigh in the freezer, Krueger answered that Warner folded her legs, put her in a plastic garbage bag and then a suitcase, and put the suitcase in the freezer, which had no food in it.

Krueger said she promised the men who came to the apartment early Saturday morning that she would call the police, but she didn't. Krueger said she was afraid to call the police because Warner told her that if he went to jail, the men would come for her. She also said that Warner had her phone most of the time, but she turned on her phone

once and saw that she had a lot of text messages and knew that the police would be coming.

Krueger said that when Warner got angry he would yell a lot, but generally not get physical, except that once he got angry and slammed a door on her hand; she didn't know if he had done it on purpose. When Warner was on methamphetamine, he would be up for days and his temper would be much shorter.

As far as Krueger knew, Warner was good to Kayleigh. He spanked Kayleigh with an open hand a couple of times on her bottom; Krueger told him not to do that anymore and Warner said he wouldn't. During the last couple of weeks of Kayleigh's life, Kayleigh and Warner got along very well together—she would sit on the couch with him and hug him. Sometimes he would get angry with Kayleigh because he thought "she was holding in her poop." At first Krueger thought it was strange that he would take Kayleigh to the bathroom, but she was okay with it because she would hear Kayleigh tell Warner that she loved him and say that she wished he was her dad.

Hess left the room for a time; when he returned, he said he had been talking with Warner and had some more questions for her. He asked about Krueger trying to give Kayleigh popsicles after she was sick to make her better. He asked if she had hit her, and Krueger said she had raised her voice at Kayleigh to get her to eat them but did not touch her. She said she spanked Kayleigh in the past, a long time ago, but apart from that never put her hand on her.

He asked about going out for ice cream. Krueger said that Warner wanted to get ice cream, but she couldn't eat it; Warner ate most of it. They also got cigarettes, and she smoked to calm her nerves.

When she found Kayleigh dead, she saw bruising on her buttocks or "red butt" from Warner spanking her. She also saw bruises on Kayleigh's back that Warner said were "from the red butt." She said she saw only a few tiny bruises, and she didn't see any on Kayleigh's stomach. When she saw Kayleigh dead, her first thought was that "she didn't pour out the water," that she "drank that stuff and we poisoned her."

9. *Medical Experts*

Two medical experts testified for the prosecution, forensic pathologist Dr. Joseph Cohen, who performed the autopsy on Kayleigh on February 3, and Dr. James Crawford-Jakubiak, a child abuse pediatrician, who had reviewed Kayleigh's medical records as well as documents, photographs and x-rays from the autopsy.

Kayleigh was 41 inches tall and weighed 34 pounds. Dr. Cohen identified 41 external injuries on the body, which appeared to have been made within hours to two or three days before death.[14]

> 14. Some of Kayleigh's injuries, including a healed broken rib, occurred a few weeks before death. Dr. Crawford-Jakubiak testified that the broken rib would have caused Kayleigh pain, including when she moved, and that given her age, Kayleigh would

have communicated the nature of the injury.

There were numerous blunt force injuries to the front and back of the torso, reflected in small and large bruises, mostly on the abdomen, but also on the back and buttocks. Dr. Cohen counted 8 to 15 individual bruises to the abdomen, indicating 8 to 15 individual impacts. There were also external injuries to the extremities, i.e., the arms, forearms, thighs, legs and knees, as well as injuries to her head, which were reflected in bruises on her forehead, cheek and under her chin, and internal injuries to her scalp, one corresponding to the bruise on her forehead, and one on her temple.

Dr. Cohen testified that moderate force would have been required to inflict the injury to the head that resulted in interior bruising, and that "moderate to severe" force would have been required to inflict the other external injuries that he observed. None of the injuries to the abdomen would have resulted from a spanking. Nor were the injuries to the buttocks, back, or thighs caused by a "typical" spanking. Dr. Crawford-Jakubiak opined that the extent of injuries on Kayleigh's body was far beyond what would commonly be suffered by a three-and-a-half-year-old in the course of her life, and were caused by repeated episodes of major blunt force trauma. The injuries were consistent with beating, not with spanking or falling from a bike.

Dr. Cohen noted that the skin over the entire abdomen was green, a sign of infection. When he opened the abdominal cavity, about two cups of liquid poured out, consisting of blood and intestinal contents. The source of the liquid was a rupture in the wall of the small intestine in the middle of a 12-inch segment of the intestine that was necrotic (i.e., dead or dying). In addition to the injury to the intestine, Dr. Cohen observed blunt force injury to the mesentery, which is the tissue that holds the intestine in place and is anchored near the spine. Dr. Cohen also found a small recent injury to the front of the spine. He found no evidence of constipation, abdominal disease, or a spontaneous rupture.

The cause of death was abdominal trauma, which caused a lack of blood flow in the belly, as well as damage to the intestine. As a result of the trauma and lack of blood flow, the intestinal tissue became necrotic. The intestine perforated and its contents spilled into the belly, ultimately resulting in shock and death. Dr. Cohen stated that Kayleigh had been abused and neglected. As to neglect, he opined that "it would have been very clear that Kayleigh was in harm's way after receiving the lethal injury, that the lethal injury if treated early would have resulted in survival through surgical excision of that dead portion of small intestine." Neglect was also reflected in Kayleigh being dehydrated and slightly malnourished. Dr. Crawford-Jakubiak noted that from just after her birth until just after her third birthday, Kayleigh went to the doctor frequently and Krueger often called the nurses for small problems. On a couple of occasions, Krueger sought care for Kayleigh when Kayleigh was vomiting. Kayleigh's history of medical care abruptly stopped in June 2013.

Dr. Cohen testified that after suffering a blow to the abdomen that resulted in the injuries he observed in Kayleigh, a child would have cried and would have suffered discomfort, pain, nausea, vomiting,

14

and loss of appetite. The symptoms would have progressed over time to unconsciousness and death. Dr. Crawford-Jakubiak testified that the fatal injury to her abdomen would have been very painful and Kayleigh would have cried, probably vomited, and expressed what happened in words. As the injury progressed and the bowel died, Kayleigh would have vomited, could have passed blood from her anus, and would have experienced great pain for an extended period of time until she lost consciousness.

Dr. Cohen testified that a "substantial" amount of force would have been required to injure her spine, and a "severe" amount of force would have been required for the fatal injury, and in each case the force came from blows to the front of the body. He could not be certain how many impacts caused the injuries; it could have been one or two or more.

Neither Dr. Cohen nor Dr. Crawford-Jakubiak could determine exactly when Kayleigh died. Dr. Cohen testified that based on the state of the body's reactions to the injuries and the fact that the reactions stop at the time of death, he estimated that the fatal injury to the intestine and mesentery was inflicted more than 12 hours before Kayleigh died, and probably 18 to 24 hours up to two or three days. From the necrosis of the bowel and the amount of fluid in the abdomen, Dr. Crawford-Jakubiak concluded that the fatal injury occurred at least a day before Kayleigh died, and possibly longer. The experts agreed that, based on the descriptions of Kayleigh's behavior during the January 27 police visit, when she was active and engaging with people in her environment, and the January 29 visit, when she was quiet and during which she vomited, that the fatal injury occurred between the two visits.

Dr. Cohen noted that an "atypical" lividity pattern on the body indicated that it had been moved after death.

### 10. *Police Investigation*

Investigators obtained, and played for the jury, video footage from Target corresponding to the day and time shown on the receipt found with Warner's cell phone. Detective Hess noted that the footage shows Krueger and Warner buying ice cream on January 31 at about 3:00 p.m. and that the container was consistent with one found in Krueger's apartment. He noted that Krueger was ahead of Warner when they entered and left the store and did not appear to be under duress or upset in the footage.

Video surveillance footage from the San Francisco International Airport (SFO), also played for the jury, showed Krueger and Warner on an airport tram at about 11:15 p.m. on February 1. Detective Hess testified that Krueger appeared calm in the video. He noted that the video shows Krueger and Warner conversing, and shows Krueger resting her head on Warner's shoulder and then trying to snuggle with him and shows Krueger laughing or giggling. Hess stated that she did not cry or act upset; she appeared to be affectionate toward Warner, and did not appear to be afraid of him or under duress.

Krueger's medical records showed that she was treated for a hand injury on January 9 and told treating personnel that the injury was

caused by her boyfriend, "Ryan Howard," who had accidentally slammed her hand in the door. She was also seen for a hand injury on January 10 at a different facility, and she told the treatment team that a friend had accidentally slammed her hand in the door.

Kayleigh's medical records showed that Krueger had taken Kayleigh to the emergency room about seven times during the first three years of her life, including when Kayleigh had possibly ingested hand sanitizer. Krueger had also taken Kayleigh to nine appointments, and she had two phone appointments.

An investigator who examined the computer found in Krueger's apartment testified that the web browsing history reflected a search for the phrase "stabbing pain next to bellybutton," but not the date or time of the search. He also determined that at about 11:00 p.m. on January 29, two video files were accessed or downloaded: Terminator 2, Judgment Day and The Secret Life of Walter Mitty.

Another investigator testified that a review of web browsing on Krueger's phone during January showed a search on January 23, a week before Kayleigh's death, asking whether vitamin E is good for bruises, and at about the same time frame, searches on how to get rid of bruises now. On January 24, there were continued searches on the same topics. On January 25, there was a search for an article to the effect of a woman booked or jailed on suspicion of child abuse. On January 31, after Kayleigh's death, there were searches for U.S. cities, including a search for U.S. cities with the highest population.

Investigators reviewed text messages on Krueger's phone between Krueger and Robin Slusher. On December 17, 2013, Krueger asked Robin to bring ibuprofen for Kayleigh, as well as some food that would be easy on her stomach. Krueger told Robin this was the sickest Kayleigh had been in a long time. When Robin asked about Kayleigh the next day, Krueger said that Kayleigh had a fever of 100.4, down from 102.1. Texting between the two on Kayleigh's condition continued through December 20, 2013, when Krueger reported that Kayleigh was still sick and had been throwing up all night.

In mid-January there was another series of text messages between Krueger and Robin. On January 16, Krueger reported that Kayleigh had a fever and was throwing up. Robin asked about Kayleigh the next day and was told Kayleigh had horrible diarrhea and a fever. Robin checked in again on January 18 and 19; each time, she was told that Kayleigh was still sick. Robin asked to see Kayleigh, but Krueger said no.

Robin contacted Krueger by text on January 25 and 26, wanting to see Kayleigh. Krueger did not respond until January 27, when she informed Robin that Kayleigh was very sick and she was waiting for a phone appointment with the doctor. When Robin checked in later to find out what the doctor had said, Krueger responded that the doctor said it was a nasty flu season and she should keep Kayleigh inside, give her fluids and monitor her for 48 hours.

During these periods there was no indication on the phone or in Kayleigh's medical records that Krueger had sought medical advice

16

regarding Kayleigh.

The last text exchange with Robin was on January 31, when Robin asked to see Kayleigh and Krueger responded that they were going to Santa Cruz.

Investigators found that starting on January 30 at about 4:30 p.m. there were 76 outgoing phone calls from Krueger's cell phone to Valdez, as well as missed incoming calls from Epperson and Robin. There was an outgoing call on January 31 at about 3:00 p.m. to a number that allows recipients of welfare to check the status of their benefits. This call was made just before the purchase of ice cream at Target.

**C. Defense Case**

In her defense, Krueger called fact witnesses, offered her own testimony, and called an expert witness.

1. *Fact Witnesses*

Linda Reed testified that from April through June of 2013, Krueger occasionally worked as a substitute at Reed's daycare center, which Kayleigh attended. Reed thought Krueger was a good mother and asked her to work as a substitute based on seeing Krueger interact with Kayleigh.

Krueger's father, John Krueger (John), testified that when he saw Kayleigh on Christmas Day 2013, she was behaving normally, and that the last time he saw Kayleigh was about a week before she died. After that, at the end of January 2014, he tried to see Kayleigh, but was told by Krueger that Kayleigh was sick with the flu.

John testified that he and Krueger had a close relationship and used to talk on the phone every day. Their contact became less frequent after October 2013. By mid-January 2014, John was aware that Krueger was using drugs.

2. *Krueger's Testimony*

Krueger testified that she met Jason at a drug house when she was 16. At that time she had a "problem" with methamphetamine, and they used it together every day. Later, they used only on weekends. After about five months they became intimate, and when Krueger was 17 she moved in with Jason at his parents' home.

Jason was jealous, and he accused Krueger of cheating on him. The jealousy led to frequent arguments in which Jason became violent and struck her. He called her names, told her she was worthless, and harassed her when she went to see friends, so she stopped seeing many of them.

At 19, Krueger became pregnant, stopped using methamphetamine, and delivered Kayleigh in May 2010. Jason was in jail during part of the pregnancy, having been convicted of domestic violence for slamming Krueger's arm in a car door. On his release from jail, Jason continued using methamphetamine, and when he was coming off a high, he was sometimes violent. In June 2013 he was arrested and sent to prison after he threatened to kill Krueger and kidnap Kayleigh.

While Jason was in prison, Krueger reconnected with Warner, with whom she had been acquainted when she was 15. She invited him to visit, which he did in August 2013. At first Warner was going to stay for just a couple of days, but he ended up moving in with them. Krueger described Warner's relationship with Kayleigh as "[g]ood, like a stepdad." Like a good parent, he played with Kayleigh, helped with toilet training, and seemed very loving. Warner would have Kayleigh sit on the toilet for 15 or 20 minutes to have a bowel movement, and sometimes Krueger and Warner would argue because Krueger thought that was too long, but Warner told her that Kayleigh "was so backed up and constipated" and that "it was borderline child abuse to let her hold it in all day long" because she would be in so much pain when she finally moved her bowels, and Krueger thought it was better for Kayleigh to sit on the toilet than be in pain.

The first day Warner arrived, Krueger resumed her methamphetamine habit with him. They would smoke methamphetamine in Krueger's bedroom; Kayleigh would play in her bedroom or watch a movie. From the beginning of December 2013, Krueger was using methamphetamine every day. She would take a "hit" or two of methamphetamine for a "boost," five or six times a day, and used marijuana to ease the feelings of coming down from the high, sleeping every night or every other night. She agreed that she was high pretty much all the time from Thanksgiving through January.

Krueger initially testified that she would buy marijuana, but not methamphetamine. She said that Kent would come over and leave them some, or Warner would trade video games to a friend for drugs. Later, she testified that she would also go to friends' houses and use there and sometimes they would give her some to take home. Eventually, after reviewing texts she had sent and a transcript of a telephone call from jail, she admitted that she would spend money on marijuana, which she would trade for methamphetamine with her friends because they gave her a better deal, and that she had bought methamphetamine at least once.

In mid-December, Krueger learned that there was a warrant for Warner's arrest. She was present on occasions when he lied to people about his name. Because of the warrant, Warner rarely left the apartment, and Krueger was usually the one to run errands, and she would often leave Kayleigh with Warner. Starting in mid or late December, she and Warner would often argue about her wanting to stop using drugs and having them around.

Krueger and Warner had verbal arguments almost daily from mid-December through January. Krueger testified that the arguments would be about getting clean and denied that they concerned the relationship. Although she wanted more from the relationship than Warner was willing to give, they argued about the relationship "maybe two times," the first of which was in November. Around Christmas, they had their "first big fight" about getting clean, during which Warner threw the Christmas tree over. On January 9, during another argument about getting clean, Warner slammed her hand in her bedroom door, injuring her badly. She and Warner went to the hospital to have her hand treated, leaving Kayleigh with a neighbor.

On the morning of January 27, she and Warner got high. Later, they had an argument: she wanted to get clean, and he didn't, so she told him to move out. Warner threw an abalone shell against the wall and pushed Krueger against her bedroom door and punched it right next to her face twice, leaving two holes in the door. Warner told her that he would leave only if she had the police remove him, and if she did that, he would have "Antonio [Valdez] and all his homies come handle [her]." Warner had told her that Valdez was a high-ranking gang member, and Krueger was afraid that if the police were involved, Antonio would come to the house and hurt her in front of Kayleigh. Krueger was also concerned that Kayleigh would be taken away because they were using drugs. The police arrived at the apartment in response to the argument, but Krueger did not tell them what Warner had said and done.

After the police left on the morning of January 27, Krueger took Kayleigh to a friend's house for several hours. She had told Warner to pack his things and leave while she was away. But while she was at her friend's house, she sent Warner a text message that said, "I really hope you're home when I get there." He responded, "I got up, made pancakes for your daughter, put cinnamon rolls in the oven ... and you woke up treating me like dog shit for nothing," to which she replied, "I am so sorry. You do so much for us. I am so sorry. I guess I was just mad because I wanted to cuddle with you last night." She and Kayleigh went back to the apartment that afternoon, took a nap on the couch, and awoke to Warner saying that he would take Kayleigh to the bathroom and then make dinner.

That night, Krueger didn't really sleep. At about 10:00 a.m. on January 28, she was taking a shower and fainted; she hadn't eaten because she was using, and Warner told her to lie down, made her some soup, and said he would take care of Kayleigh.

For the rest of the day on January 28 Krueger slept off and on, until about 5:00 in the afternoon, when Kayleigh brought her a picture she had made for her. Krueger and Warner had an argument that evening, and at some point on January 28 she sent him a text saying that she cared for him, and it was clear he would never have the same feelings for her, and she "just want[ed] to feel loved." After the argument, Krueger called her friend Epperson, crying and saying that she was upset about the way Warner treated her because she was helping him out so much and felt things were one-sided. Epperson asked if she wanted him to come over, and she said yes, so he could keep her company.

Krueger testified that on January 29, she woke at about 8:00 a.m.[15]

> 15. On February 5 and 15, 2014, in recorded telephone calls with her father, Krueger said she had been awake for 30 hours, since she last used methamphetamine, when she fell asleep on the morning of January 30.

and Epperson arrived soon thereafter. That day she smoked marijuana but did not use methamphetamine, contrary to Epperson's testimony.

During the day she was "periodically" in her bedroom with the door closed, and Kayleigh was in another room watching a movie. That afternoon, at about 4:00 or 4:30, Krueger was in her bedroom and heard Warner say, "[W]hat happened, did you throw up?" Krueger, who was under the effects of "coming down" from methamphetamine and high from smoking marijuana, went into the bathroom where Kayleigh was, and saw vomit on the floor, brown liquid in the sink, and a measuring cup on the floor in which Warner had a tobacco pipe soaking in water and Windex. Kayleigh said she was thirsty and that she got new water. As far as Krueger knew, that was the first time Kayleigh vomited that day.

Krueger testified that she wanted to call poison control because she thought Kayleigh had swallowed tobacco; Warner said no, that it was okay and that Kayleigh just needed to throw up and that they should give her water. Epperson reminded Krueger that when Kayleigh was a baby she had eaten half a cigarette, Krueger had called poison control, which told her that she would throw up and to give her water. So she gave Kayleigh water, and Warner put his finger in her throat a couple of times to get her to throw up. Kayleigh threw up about six times; the last time was while the police were there that evening. Kayleigh was sitting in Krueger's lap when she vomited; the vomit was red from Pedialyte that she had given Kayleigh, and it got on Krueger's clothes.

Krueger said she told the police that Kayleigh had been throwing up; they said they were done with her and that she should go get cleaned up. The police left while she was in the shower, with Kayleigh sitting in the tub playing. Warner knocked on the bathroom door, and Krueger clung to him and cried because she was afraid Kayleigh would be taken away because of the drugs in the house.

Krueger did not notice anything unusual about Kayleigh while she was in the tub. The only bruises she saw were bruises she knew about: a few on her lower back, two little ones on her chin, and one on her forehead. Kayleigh had told her the bruises were from bumping her head on the table or from her bike. Previously, before her hand was slammed in the door, Warner had told her that Kayleigh had jumped up from the toilet to hug him, and they bumped heads, giving him a swollen eyebrow and Kayleigh a black eye. The black eye had gone away by January 29.

After Krueger put Kayleigh to bed, Kayleigh woke up a few times whining that she was thirsty. Krueger gave her Pedialyte, thinking that the tobacco she had drunk was gone and she was waking up thirsty from having thrown up so much.

Krueger did not sleep until about 4:00 in the morning on the 30th. When she went to bed, Kayleigh was in the bathroom with Warner. Krueger woke at 4:00 in the afternoon. She had expected to find Kayleigh in bed with her, looked at her phone to see what time it was, and then, concerned that she had slept so long, went to find Kayleigh, who she found on the bathroom floor lying on her stomach. Krueger thought she was asleep, and went back to the bedroom and asked Warner, who was waking up, why Kayleigh was sleeping on the floor. Krueger went back to check on her, called her name, and went to

shake her, but realized that Kayleigh was dead when she touched Kayleigh's leg, which was cold and stiff. There was a bruise on Kayleigh's bottom that she had not seen before.[16]

> 16. Krueger testified that she did not see other bruises on Kayleigh when she found the body.

She started screaming that Kayleigh was dead and started to pick Kayleigh up. Warner ran into the bathroom and took Kayleigh from her arms. He started shaking Kayleigh and poking at her stomach, and said, look, she's breathing. Krueger told him to stop and give Kayleigh to her, which he did. Krueger said they needed to call 911. Warner said he needed 10 minutes to process what had happened, and he took Kayleigh and put her on her bed.

When Krueger asked for her phone to call 911, Warner said the police would think he did something to Kayleigh because of the bruise on her bottom. He told Krueger that the day before, Kayleigh had gotten out of a time out early, and he spanked her, but he didn't think he had spanked her hard, but apparently he had. Krueger told him a spanking would not kill Kayleigh and there must have been more Windex in the cup, which she must have drunk and which poisoned her. Krueger testified at trial that she still believed that Kayleigh died from drinking the Windex and tobacco solution.

Although Krueger had told Detective Hess in her interview that she was in and out of Kayleigh's room after she found Kayleigh on January 30 and on January 31, she testified at trial that Warner would not let her into Kayleigh's room until after she took Kayleigh's body from the freezer.

On Friday afternoon, Warner said he needed to get out of the house, so they went for a walk, and ended up at Target, where Warner bought ice cream. They returned to the apartment, and late that night or early Saturday morning, Valdez and his brother came over at Warner's request. The four of them talked in Valdez's car. Warner said that Kayleigh had drunk something and died, and that he needed help to get away and get rid of her. Krueger was crying, and Valdez yelled, why didn't you call the police. Krueger told him that she wanted to. She testified that she did not call, and asked why not, she testified that Warner had her phone.

After Valdez and his brother left, as Krueger was dozing off, she heard Warner say something about the freezer. She awoke at about sunrise and could not recall whether he had actually said that; she asked him if Kayleigh was in the freezer. When Warner said yes, she went to the kitchen, opened the freezer, took out the bag with Kayleigh's body, and removed the body from the bag. She noticed the body had a red, purplish color on the side that had been lying on the floor.[17]

> 17. Krueger testified that although she had since seen photographs that show bruises all over Kayleigh's body, including on her stomach, she did not see other bruises when she found the body or when she took the body from the freezer and laid it on the bed.

She put Kayleigh's body back in her bed, under blankets.

Later that morning, they left the apartment. One of the last things Krueger did before leaving was pack a bag of "special clothes of Kayleigh's and hospital clothes and first birthday clothes." The bag was marked "Please give to my mom." After leaving the apartment, Krueger and Warner tried to sell some video game equipment at Game Stop to get money, and then went to Home Depot where she arranged with Vasquez to give them a ride to Vallejo. Warner had told her they should go to Vallejo, and she assumed that was to get a bus, but she didn't know where they would go from there. Warner told her he would give her the phone and let her call the police when they got out of town.

At Vallejo, they took a bus to the El Cerrito Del Norte BART station, arriving at about 1:30 p.m. on Saturday, February 1. They took BART to San Francisco and went into a fast food restaurant, where Warner gave her phone back and said she could call the police. She turned on the phone and saw dozens of messages, and she knew that the police had found Kayleigh. She told Warner she wanted to go back to Napa and go to the police station herself rather than calling. Warner said he would go with her, but as they started walking back to the BART station, Warner said he wanted to go to the beach and smoke some marijuana that Krueger had with her, and then they would head back. So they went to the beach, and later took BART to SFO. It was too late to get a bus to Napa, so they went to the airport where they sat on chairs for the rest of the night. Krueger added that "before the airport, we were gonna go to a church." The next day they took BART back to El Cerrito Del Norte, where they were arrested.

Krueger testified she had spanked Kayleigh just three or four times in her life, with an open hand on Kayleigh's bottom. She did not yell at Kayleigh during the last week of her life, except on January 29, when she was on the couch with Kayleigh trying to get her to eat a Pedialyte popsicle to rehydrate her. Warner came out of the bedroom and said to Kayleigh, are you not listening to your mom, at which point Kayleigh took a bite from the popsicle. Krueger said she was not concerned that Kayleigh was seriously ill, but just worried about dehydration and noted that it was unusual for Kayleigh to refuse to eat a popsicle.

Krueger admitted that Kent and Patterson each expressed dislike for Warner, who they characterized as arrogant. Her father disliked Warner because he thought Warner should be working. In January 2014, Krueger and her father fought about the fact that he thought she was using drugs and that that he didn't approve of Warner living in her home.

Krueger admitted that child protective services (CPS) was supervising her with Kayleigh from the time Kayleigh was five months old until she was almost two. She also admitted that during that time Jason went to prison for an incident that occurred when he came to her apartment, grabbed her arm, and twisted it. She told her CPS worker that she had lied to the police, and that Jason had not assaulted her but had been jumped by gang members. She admitted at

trial that what she told CPS was a lie. The truth was that she had fought back when Jason assaulted her and it had left marks on him, and she and Jason were concerned that she would get in trouble with CPS for fighting him.

Krueger testified that Warner did not physically abuse her as Jason had; the only physical injury she ever received from Warner was the injury to her hand when the door slammed, and she did not know whether that was intentional on his part. Unlike Jason, Warner did not try to prevent her from seeing her friends.

### 3. *Expert Testimony*

Marriage and family therapist Linda Barnard testified as an expert in intimate partner battering and the psychological concept of dissociation. Intimate partner battering creates "coercive control" even if physical force is absent. Abuse followed by kindness creates a bond, which is enhanced by isolation of the victim from other support.

"Cumulative traumatic stress" leads to changes in the brain. Memory of a traumatic event may be disordered and inconsistent. Perception may be altered. A person who has been the victim of trauma, including intimate partner battering, and who suffers a traumatic event, like finding their child dead on the floor, might not notice aspects of the child's body, such as bruising.

Dr. Barnard testified that dissociation is commonly part of a response to trauma, whether cumulative trauma or an extremely traumatic event. A dissociative response can include a failure to register information about a traumatic event and loss of memory of details surrounding a traumatic event. The person may be unable to describe events in sequence, or may remember some things but not others. A person in a dissociative state "feels like they're split off from their feelings," or "their behaviors show that they're somehow not connected to the behaviors that they're doing, that there's a disconnection there," but might be able to negotiate with a cab driver for a ride, or perform routines tasks, like laundry. A person undergoing an extreme dissociative episode cannot function, but more commonly, a person in a dissociative state has a flat affect even when talking about the traumatic event.

After interviewing Krueger, reviewing a transcript of Krueger's testimony, and the video of Krueger's interrogation by Detective Hess, as well as various police reports, medical reports, Kayleigh's autopsy report, and a receipt from Target, Dr. Barnard diagnosed Krueger as suffering from posttraumatic stress disorder with depressive symptoms. Dr. Barnard opined that Krueger experienced multiple traumatic events in her life, including being involved in two relationships that included intimate partner battering: one with Jason Slusher, characterized by numerous incidents of physical violence, and one with Warner characterized by strident arguments and three incidents of physical violence.[18]

> 18. Dr. Barnard opined that other traumatic events in Krueger's life included experiencing violence in her home growing up, abandonment issues with her

parents, physical and verbal abuse from her father, being molested multiple times by a boyfriend's father, being the victim of a rape by two men at the age of 14, and experiencing a car accident. Krueger had testified to these incidents.

Dr. Barnard opined that the trauma affected Krueger's memory, perception, behavior, outlook and beliefs, that Krueger went into a dissociative state upon finding Kayleigh dead, and that the dissociation was probably prevalent for the first few days, including the first days after her arrest, and intermittent from then on.

**D. Rebuttal**

Psychiatrist Mikel Matto, an expert in dissociative disorders, the effects of trauma, and intimate partner battering, opined that Krueger had a demonstrated history of abuse from Jason that impaired her reasoning and judgment, but that she did not have such a history with Warner, and that there was no evidence that her relationship with Warner affected her like the relationship with Jason. Dr. Matto said that when he interviewed Krueger in March 2017, she described a dissociative episode that lasted almost three months from her discovery of Kayleigh's body, but Dr. Matto did not believe that Krueger was actually in a dissociative state. Dr. Matto opined that Krueger's behavior during that period, as reflected in her actions and appearance in the videos, including those from Target and SFO (which Dr. Barnard had not viewed), and her recall of details when she was interviewed by Detective Hess, were inconsistent with dissociation.

*Krueger*, 2021 WL 194189 at *1–18.

## DISCUSSION

### I.      Standard of Review

A petition for a writ of habeas corpus is governed by the Antiterrorism and Death Penalty Act ("AEDPA") under which a district court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *Williams v.*

*Taylor*, 529 U.S. 362, 412–13 (2000).  Additionally, habeas relief is warranted only if the constitutional error at issue "'had substantial and injurious effect or influence in determining the jury's verdict.'"  *Penry v. Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence.  *Williams*, 529 U.S. at 412.  A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent."  *Id.* at 405–06.  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.  "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous."  *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).

The state court decision to which § 2254(d) applies is the "last reasoned decision" of the state court.  *Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091–92 (9th Cir. 2005).  Petitioner first raised these claims in her appeal to the California Court of Appeal.  The Court of Appeal's January 20, 2021 decision was the last reasoned state court decision that addressed these claims.  Accordingly, in reviewing this habeas petition, this Court reviews that appellate court decision.  *See Ylst*, 501 U.S. at 803–04; *Barker*, 423 F.3d at 1091–92.

## II.     Petitioners' Claims

### A.  *Batson* Error

Petitioner claims that the prosecution "dismissed prospective juror [D.B.] based on her race," and that the trial court improperly denied her motion under *Batson v. Kentucky*, 476 U.S. 79

United States District Court
Northern District of California

1    (1986).  She argues that the "record fails to support [the] prosecutor's stated reasons."  ECF No. 1

2    at 5.

3                                    **1.   Federal Authority**

4           It is unconstitutional for a prosecutor to challenge a potential juror solely on the basis of

5    their race or gender.  *Batson v. Kentucky*, 476 U.S. 79, 89 (1986), *see also J.E.B. v. Alabama ex*

6    *rel. T.B.*, 511 U.S. 127, 130-43 (1994).  This is true even where the defendant and the excluded

7    juror are not of the same race (or gender).  *Powers v. Ohio*, 499 U.S. 400, 402 (1991).

8           *Batson* identifies a three-step process for evaluating claims of a race-based juror challenge.

9    First, the defendant must make out a *prima facie* case that the prosecutor exercised peremptory

10   challenges on the basis of race "by showing that the totality of the relevant facts gives rise to an

11   inference of discriminatory purpose."  *Batson*, 476 U.S. at 93-94.  Second, if the requisite showing

12   has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for

13   striking the jurors in question.  *Id.* at 97; *Wade v. Terhune*, 202 F.3d 1190, 1195 (9th Cir. 2000).

14   Finally, the trial court must determine whether the defendant has carried his burden of proving

15   purposeful discrimination.  *Batson*, 476 U.S. at 98; *Wade*, 202 F.3d at 1195; *Green v. Lamarque*,

16   532 F.3d 1028, 1030 (9th Cir. 2008) ("Third, if the prosecutor offers a race-neutral explanation,

17   the trial court must decide whether the defendant has proved the prosecutor's motive for the strike

18   was purposeful racial discrimination.").  To fulfill its duty, "the trial court must evaluate the

19   prosecutor's proffered reasons and credibility under the "totality of the relevant facts," using all

20   the available tools including its own observations and the assistance of counsel."  *Mitleider v.*

21   *Hall*, 391 F.3d 1039, 1047 (9th Cir. 2004) (quoting *Lewis v. Lewis*, 321 F.3d 824, 831 (9th Cir.

22   2003)).

23          A defendant meets the first-step prima facie showing where (1) the defendant is a member

24   of a cognizable racial group, (2) the group's members have been excluded from the jury, and (3)

25   the circumstances of the case raise an inference that the exclusion was based on race.  *Batson*, 476

26   U.S. at 96.  *See also Powers*, 499 U.S. at 416 ("Racial identity between the defendant and the

27   excused person might in some cases be the explanation for the prosecution's adoption of the

28   forbidden stereotype, and if the alleged race bias takes this form, it may provide one of the easier

United States District Court
Northern District of California

cases to establish both a prima facie case and a conclusive showing that wrongful discrimination has occurred.").  The Ninth Circuit has articulated an updated version of this prima facie test, requiring a demonstration that "1) the prospective juror is a member of a 'cognizable racial group,' (2) the prosecutor used a peremptory strike to remove the juror, and (3) the totality of the circumstances raises an inference that the strike was motived by race."  *Boyd v. Newland*, 467 F.3d 1139, 1143 (9th Cir. 2006).

The inference of discrimination standard "is a less burdensome standard of proof than the preponderance ('more likely than not') standard.  *United States v. Collins*, 551 F.3d 914, 920 (9th Cir. 2009).  The Supreme Court "did not intend the first step to be . . . onerous."  *Johnson v. California*, 545 U.S. 162, 170 (2005).

The Ninth Circuit has held that "[t]o establish a prima facie case, [a petitioner does] not need to show that the prosecution ha[s] engaged in a pattern of discriminatory strikes against more than one prospective juror" because "the Constitution forbids striking even a single prospective juror for a discriminatory purpose."  *Boyd*, 467 F.3d at 1147 (quoting *United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994)).  *See also United States v. Chinchilla*, 874 F.2d 695, 698 n.5 (9th Cir. 1989) ("although the striking of one or two members of the same racial group may not always constitute a prima facie case, it is preferable for the court to err on the side of the defendant's rights to a fair and impartial jury").

The Ninth Circuit has also held that when a defendant alleges a *Batson* claim that is plausible, containing a "potential inference," a court must analyze the context in which the contested peremptory strike arose in order to determine whether a prima facie case exists.  *Boyd*, 467 F.3d at 1146-47 (finding the claim "at least plausible" where the defendant and struck juror were both African American, the juror was the second African American removed from the panel, after the first was removed for cause, there were only two remaining African Americans in the juror pool, and "nothing in the struck juror's voir dire responses intimated a legitimate basis for removal.").  The two main ways the court can consider context are by looking at percentages and by engaging in comparative juror analysis.  The Ninth Circuit has found an inference of discrimination "where the prosecutor strikes a large number of panel members from the same

1   racial group, or where the prosecutor uses a disproportionate number of strikes against members of

2   a single racial group." *Collins*, 551 F.3d at 921.  But percentages may be inapplicable where there

3   are few members of a particular racial group in the juror pool.  *See id.* (where there were three

4   African Americans in the venire, and the first was struck by the defense, the second was the juror

5   removal subject to the *Batson* challenge, and the third was struck by the court for cause,

6   "mathematical trends and patterns" were "meaningless").

7        Comparative juror analysis may also establish an inference of discrimination at *Batson*'s

8   first step.  *Boyd*, 467 F.3d at 1147-48; *see, e.g., Shirley v. Yates,* 807 F.3d 1090, 1097 (9th Cir.

9   2015) (finding additional support for inference of discrimination where black venireperson was

10   struck while similarly situated white venireperson was not); *Collins*, 551 F.3d at 921-23 (finding

11   inference of discrimination, based on comparative juror analysis, in striking of the only African-

12   American prospective juror).  While the Ninth Circuit has not held that "comparative juror

13   analysis *always* is compelled at the appellate level," it has called it "an important tool that courts

14   *should* use on appeal."  *Boyd*, 467 F.3d at 1148-49.

15        Other circumstances that can raise an inference of discrimination include "[s]triking

16   members of more than one protected group," *Collins*, 551 F.3d at 921 (citing *Fernandez v. Roe*,

17   286 F.3d 1073, 1079-80 (9th Cir. 2002)); "[a] prosecutor's questions and statements to the

18   venire," *id.* (citing *Batson*, 476 U.S. at 97); or "the fact that the prosecutor fails to 'engage in

19   meaningful questioning of any of the minority jurors'," *id.* (quoting *Fernandez*, 286 F.3d at 1079).

20        Where the defendant fails to raise an inference of discrimination at the first step, neither

21   the trial court, nor a reviewing court, nor a federal habeas court need reach the third step.

22        **2.  Appellate Court Decision**

23        The state appellate court rejected this claim.  First, it summarized the voir dire process with

24   respect to juror D.B.:

25        1. *Additional Facts*
     At the beginning of jury selection on the morning of April 19, 2017,
26   the trial court stated that the trial would likely be finished the first
     week in June, and asked, "Is there anyone here in the jury panel who
27   believes that's going to be an issue for you that you didn't mention in
     your papers?"

28

*United States District Court*
*Northern District of California*

28

D.B. voiced concern about the length of the trial: "I have a granddaughter who's expecting her baby any day now and she is kind of a high risk and we've got someone covering for me now. She's in Fairfield. There's no one staying with her to—because she's alone. So we're at that point now where someone has to be with her. So I've got—so it's kind of like passing the torch to be with her now. [¶] So not knowing that—how long this would take—we're hoping that she has the baby and that's my great grandbaby, so it's one of those things that—I'm hoping that she has the baby while—I just didn't expect it to go this long. So it's one of those things."

In response to questioning, D.B. told the court she was a resident of Napa; was married; she had worked for the Vallejo Health Department but went out on disability; her husband was retired; she had three grown children, whose ages and jobs she described, and several grandchildren; she was very excited about the upcoming birth of her great grandchild; and her mother-in-law remembered the trial judge "from way back in the day." She said, "I do believe I can be fair, because I'm a fair person. There's always two sides to every story. I always felt like that, but I do feel strongly about it because I do have grandchildren. But I do feel I could be fair about it." The court noted, "I haven't forgotten what you stated about your great granddaughter ready to be born."

Later that morning, the judge and attorneys spoke with D.B. outside the presence of the jury. The court addressed D.B.: "[Y]ou indicated that you received a text that your ... granddaughter is in labor? [¶] We would really like to keep you because we think you could be fair and impartial. Is there any—." D.B interjected, "That's what I'm trying to, I would like to take the call." The colloquy continued:

"THE COURT: "Somebody is there at the hospital with her?

"[D.B.]: I'm trying to see if I can get somebody to cover. Because her step dad is there—this is the first baby, so she's probably got time.

"THE COURT: Usually they're in labor for a while.

"[D.B.]: But she's been dilated ... to three and a half since for a week now. Oh, okay. And she says she's not going back to the hospital until—until she feels ready.

"THE COURT: I'll let you go ahead and make the call and let us know how things are going, because we would love to keep you as a juror if possible.

"[D.B.]: So I can step out?

"THE COURT: Please."

Shortly after that, the court asked D.B, "[W]ere you able to get somebody?", to which D.B. replied, "Yeah."

Still later in the morning, the prosecutor observed that "there was some concern expressed in some of the questionnaires about seeing" photos of the injuries to Kayleigh, including photographs of the

exterior and interior of her body. The prosecutor then asked D.B. if she would hold it against him if he showed her certain photos of Kayleigh's body. This colloquy followed:

"[D.B.]: I don't know how. I can't answer that until—because I do have grandchildren and I am expecting the new born. So I can only be honest answering that to you because I don't know how I would feel about that.

"[PROSECUTOR]: It's hard to specifically answer that question –

"[D.B.]: Yes.

"[PROSECUTOR]: —without having seen the photos. [¶] What I wanted to do is not have you sworn as a juror in this case and start showing evidence and pop photos up and have you—because I think if we've talked about it before, no one likes these charges, that's not the issue.

"[D.B.]: You just bringing that up to me has got my heart beating.

"[PROSECUTOR]: Okay. [¶] I have a daughter who loves to go to horror movies with me but I feel like most of the time I turn to her and she's doing this and you can't do that in this trial.

"[D.B.]: Right.

"[PROSECUTOR]: You got to pay attention. You've got to look, you got to evaluate because it's going to be discussed by witnesses, you're not gonna just see pictures. There's got to be a witness that helps explain the picture for you but you'll see multiple pictures of the outside of Kayleigh's body, front and back, and you'll see multiple pictures of the inside of her body.

"[D.B.]: That's going to be hard for me.

"[PROSECUTOR]: It's going to be hard for anybody.

"[D.B.]: It's hard for me right now just hearing you say that.

"[PROSECUTOR]: Okay. [¶] (Juror number 4), what's your feeling on this issue.

"JUROR No. 4: I think that, like I said, it has to be done. You're doing your job, so that is part of the process to see these photos. So again without knowing how I would feel but I do understand that's part of the process.

"[PROSECUTOR]: Just with this general concept of the photos, is there anyone who's sitting here now thinking I can't do it? Not I don't want to do it—no one wants to do it, but I can't do it in this case? Okay. For the record, no response."

Voir dire continued. That afternoon, after further questioning, the prosecution exercised six peremptory challenges and the defense exercised five. The prosecution then used its seventh peremptory

challenge to remove D.B. from the panel.

Defense counsel made a *Batson/Wheeler* objection. Outside the presence of the jury, defense counsel stated, "[T]he prosecution has excused [D.B.], an African American woman. Her answers were unremarkable. They're much like answers of all the other jurors. If she exhibited any bias ... which I don't think she did, it probably was in favor of the prosecution. [¶] She mentioned gruesome photos, how hard it would be for her to serve because of her grandchildren. But she didn't disagree with any of the principles of law, she didn't say she had made up her mind on the facts. She basically said looking at gruesome photos is hard and that's what everybody else said. That's what any reasonable person would say, and yet the Government dismissed her. I failed to discern any reason why she couldn't serve on this jury, keep an open mind, judge the facts, apply the law and render a good verdict. [¶] So I submit there's an invidious purpose to the dismissal of her."

The judge responded, "I don't know that the burden has been met. I understand that it can be made with individuals but there's been several people who have been excused that didn't set forth any bias. In fact, people we felt were not able to sit on this case we excused for hardship. But, nevertheless, so that we have a good record I'll go ahead and ask the People to set forth their reason." At that point, the prosecutor asked for clarification: "[F]or the record is the Court finding there's not been a prima facie case?" The judge replied: "I'm finding there's not been a prima facie case just because she's African American. There's another African American on the panel. There's not very many in this county. We also have people of other races ... that have been on the panel that have been excused by both sides. And the fact that that's done doesn't mean that this is an appropriate *Wheeler/Batson* motion. But in the interests of having a good record I'm going to ask you to set forth the reasons." The prosecutor then did so, and the trial court accepted them as nondiscriminatory.[19]

> 19. The prosecutor stated his primary concern was that earlier in the day, when counsel were at the bench, D.B. received a text about her great grandchild, which made her "visibly anxious." In addition, D.B. left blank question 19 on the questionnaire, which asked the age, gender, and occupation of all children, and whether they lived at home. The only indication that she had children was in her answer to question 55, which asked whether graphic evidence showing injuries to Kayleigh's body would make it impossible for her to serve as a juror: she answered, "yes," explaining "I have grandchildren." Also, D.B. answered question 43 about her prior jury service by writing "VJO" as her answer for "When/Where?" The prosecution noted that D.B. provided no other detail, including the type of case, which suggested "some confusion on her part."

*Krueger*, 2021 WL 194189 at *18-20.

The state appellate court then identified the *Batson* three-step process applicable under both federal and state law.  The court noted that, at the first step, the trial court "may also consider nondiscriminatory reasons for a peremptory challenge that are apparent from and 'clearly established' in the record . . . and that necessarily dispel any inference of bias." *Id.* at *21 (quoting *People v. Scott*, 61 Cal. 4th 363, 384 (2015)).  The court explained that, where the trial court finds the *Batson* motion fails at the first *prima facie* step, the state appellate court reviews the record for "substantial evidence" to uphold the trial court's finding.  *Id.*  The court also noted that, where the trial court finds the claim failed at the first step but nonetheless requires the prosecutor to state reasons for the challenge, the reviewing court begins with evaluating whether the trial court's first-step analysis was supported by substantial evidence.  *Id.* at *21 n.20.  If the reviewing court determines that it was, it need not review the trial court's analysis of the prosecutor's proffered reasons.  The appellate court only reviews the trial court's third step if it finds the court's first step unsupported by substantial evidence.  *Id.*

The state appellate court held that the trial court's finding that petitioner had not presented a *prima facie* case was supported by substantial evidence.  *Id.* at *23.  The state appellate court's conclusion was based on the following facts from the record: "that the prosecution did *not* strike all, most, or a disproportionate number of African Americans" as evidenced by the fact that "there was another African American juror on the panel when D.B. was challenged"; that "[n]othing in the record suggests that the prosecution struck all, most, or a disproportionate number of women"; that petitioner "is not African American—the parties describe her as Caucasian—so there is no concern that D.B. was challenged because she and [petitioner] are members of the same identified group"; that the "prosecution conducted in-depth voir dire of D.B. as well as other jurors"; that the juror had "expressed her reluctance to view the evidence"; and that the juror "might have difficulty paying attention to the evidence or she might have had to be excused after the trial began because of some complication with the labor or birth" of her grandchild and great-grandchild.  *Id.* at *22.

The state appellate court rejected petitioner's claim that the trial court improperly denied the *Batson* motion based on her failure to show "systematic bias," noting that the trial court

32

1    acknowledged that "a prima facie case 'can be made with individuals.'" *Id.*  It also rejected her

2    claim "that the sole basis for the trial court's denial of her motion was the fact that an African

3    American juror remained on the jury," finding that her argument would "require [the court] to

4    consider the trial court's statement in isolation and out of context." *Id.*  The court also noted that

5    the trial court "may have been mindful of the need for comparative juror analysis as part of any

6    third-stage inquiry." *Id.*  The court rejected petitioner's argument "that the trial court failed to take

7    the relevant factors into account in making its ruling," distinguishing her case from *Turner v.*

8    *Marshall*, 63 F.3d 807 (9th Cir. 1995) in that the trial court did more than "simply review[] the

9    racial and ethnic makeup of the excluded venirepersons and of the petit jury at the time of the

10   motion." *Id.* at *23 (quoting *Turner*, 63 F.3d at 814).[2]  The state appellate court did not reach the

11   trial court's third-step analysis. *Id.*

12             **3.  Analysis**

13             This Court need only assess, under the deferential AEDPA standard, whether the state

14   appellate court's determination upholding the trial court's finding that petitioner failed to raise an

15   inference of discrimination at the first *Batson* step was a reasonable application of federal law.  *De*

16   *novo* review is not required because the state appellate court correctly identified the controlling

17   Supreme Court authority and applied it appropriately.  *C.f. Hoyos v. Davis*, No. 17-99009, 2022

18   WL 9689892, at *10 (9th Cir. Oct. 17, 2022) (applying *de novo* review to petitioner's *Batson*

19   claim because the state court unreasonably applied Supreme Court precedent).

20             This Court finds that the state appellate court's decision on petitioner's *Batson* claim was

21   not an unreasonable application of federal law.  Although not dispositive, petitioner is not from the

22   same protected racial group as the struck juror.  There was no "'pattern' of strikes against black

23   jurors included in the particular venire." *Batson*, 476 U.S. at 97.  Petitioner could not point to the

24   disproportionate use of strikes against Black jurors, or to any evidence of the prosecution striking

25   panel members of more than one protected group.  Petitioner did not allege suspicious questions

26

27   _____

28   [2] Although not noted by the state appellate court, *Turner* was a pre-AEDPA case and was
     reviewed without the deference AEDPA requires, and the Ninth Circuit later overruled the non-
     deferential approach taken in *Turner*.  *See Tolbert v. Page*, 182 F.3d 677, 685 (9th Cir. 1999).

by the prosecution to the venire, or a failure to engage in any meaningful questioning of any minority jurors. While she argued on appeal that the prosecution's questioning of juror D.B. was "desultory," ECF No. 9-36 at 52, the record does not uphold that claim. The prosecution's questioning of D.B. was not noticeably different from its questioning of other potential jurors.[3] Federal precedent does not require that the prosecution ask the same questions of all potential jurors. *See*, *e.g.*, *United States v. Esparza-Gonzalez*, 422 F.3d 897, 905 (9th Cir. 2005) ("Although the prosecutor has no obligation to question all potential jurors, his failure to do so prior to . . . removing a juror of a cognizable group . . . may contribute to a suspicion that this juror was removed on the basis of race"). The Ninth Circuit has held that the failure to ask "*any*" questions of a potential juror prior to striking them "contributes to an overall inference of discriminatory intent." *See id.*

Petitioner's argument on appeal that the fact that the prosecution accepted the panel only after striking juror D.B. "suggests improper discriminatory motive," ECF No. 9-36 at 52, is similarly unpersuasive: accepting the panel after striking juror D.B. simply provides no relevant insight into the prosecution's motives. Petitioner's *Batson* motion was essentially based only on the fact that the prosecution struck a Black woman juror with "unremarkable" voir dire answers. *See* ECF No. 9-34 at 220.

Although the Ninth Circuit has recommended that state appellate courts conduct a comparative juror analysis, there is no Supreme Court authority requiring it, and the failure to do

---

[3] The prosecution asked many other jurors direct questions about only one issue. For example, the prosecution asked prospective juror Bowles only about her opinion about parents' responsibility to protect their children. ECF No. 9-34 at 177-79. She was later excused by the trial court for cause. *Id.* at 217-18. The prosecution asked prospective juror Picos only about her ability to set aside what she read in the news. *Id.* at 187-88. Ms. Picos was also excused by the judge. *Id.* at 217-18. The prosecution asked prospective juror Conlon only about expert testimony. *Id.* at 69-70. The prosecution later exercised a peremptory challenge to remove Mr. Conlon. *Id.* at 124-25. The prosecution asked prospective juror Lindsey only about whether his work as a firefighter involved encounters with children and whether he would have any resulting bias. *Id.* at 192-93. The defense exercised a peremptory challenge to remove him. *Id.* at 218. The prosecution asked prospective juror Casas only whether she was familiar with the case from her job at Target and whether she had any young children in her life. *Id.* at 193-94. The prosecution only asked juror no. 4 about the photographs, after speaking with juror D.B. about them. *Id.* at 85. The prosecution only asked juror no. 9 about whether they would have difficulty with the case being tried in front of two separate juries. *Id.* at 75-6.

so is therefore not grounds for habeas relief.  *See Hoyos*, 2022 WL 9689892 at *10.  The Court also notes that even if the state appellate court had considered comparative juror analysis as counseled in *Boyd*, petitioner would have failed to raise an inference of discrimination.[4]  While petitioner argued on appeal, and the trial court to some extent acknowledged,[5] that the struck juror's concerns about her granddaughter's labor had been alleviated and resolved, the fact remains that the juror had a major and potentially volatile life event taking place, and other potential jurors were excused on similar grounds.[6]  Even if the juror had found someone to be with her granddaughter temporarily, it is likely that she had anticipated being a support person for her granddaughter throughout not only the labor but the weeks after.  *See* ECF No. 9-34 at 18 ("I just didn't expect it to go this long").

In addition, the struck juror's responses to the prosecution's question about whether she would "hold it against [him]" if he showed her gruesome photographs were noticeably different than other jurors'.  ECF No. 9-34 at 84.  Juror D.B. stated it was hard for her just hearing about it and never conceded that she could do it without bias.  *Id.* at 84-85.  Juror no. 4, by contrast, whom the prosecutor questioned about the photos next, stated that looking at the photos is "part of the process" and "has to be done."  *Id.* at 85.  Although the prosecution then asked, "is there anyone who's sitting here now thinking I can't do it?", and noted "no response" for the record, *id.* at 85-

---

[4] The Ninth Circuit engaged in a comparative juror analysis in *Hoyos*, in part because "[a] comparative analysis of the treatment of jurors may . . . be central to a federal court's review of whether a state court's findings as to purposeful discrimination were reasonable, regardless of the fact that the state court was not required by clearly established law to perform such comparisons." *Hoyos*, 2022 WL 9689892 at *13 (quoting *McDaniels v. Kirkland*, 813 F.3d 770, 778–79 (9th Cir. 2015) (en banc)).

[5] The trial court explained: "I asked her if someone else could cover . . . and she said she was home alone but she was going to try to do that. She certainly was upset about it, but when she came back in it sounded like she had somebody else that was going to at least take her to the hospital." ECF No. 9-34 at 223.

[6] A potential juror was excused because her husband had Alzheimer's and she had never left him alone before.  ECF No. 9-34 at 108-109.  Another was excused because he was in remission for leukemia and taking chemotherapy and blood pressure medication that caused him to need to use the restroom frequently.  *Id.* at 106-07, 117.  Several were excused for having prepaid airline tickets during the anticipated trial time.  *See, e.g., id.* at 127-28.  The trial court excused students.  *Id.* at 132.  Potential jurors were also excused for hardship based on not receiving any jury duty pay, *see, e.g., id.* at 131-32, 140; and for having anxiety.  *Id.* at 149-155.

86, the fact that juror D.B. did not respond affirmatively to that general question to the whole venire may not have been enough to assure the prosecution that she would not be biased against them for introducing the photos.  Although, as petitioner's trial counsel noted, one would expect bias from the gruesome photographs to more likely favor the prosecution, not the defense, the way the prosecution framed the question left room to conclude that such a bias could cut against the prosecution for forcing such an unpleasant activity on the jury.  A comparative juror analysis therefore would not have shown that non-Black jurors with similar responses to D.B.'s remained on the jury, and would not raise an inference of discrimination.[7]

Petitioner argues to this Court that the prosecution's three proffered reasons for challenging juror D.B.— that she was anxious about her granddaughter going into labor, that she left a section on the juror questionnaire about her children blank, and that she wrote "VJO" as the location where she had prior jury experience—do not withstand scrutiny.  She claims that the juror's "initial concern for her granddaughter was demonstrably allayed."  ECF No. 1 at 8.  She contends that although D.B. left a questionnaire section blank regarding her children's age, gender, education and occupation, and whether they lived with her, she was "not concealing the fact she had children" as she noted her grandchildren in the questionnaire and "openly discussed her children during voir dire."  *Id.* at 9.  As for "VJO," petitioner notes that it is "obviously an abbreviation for Vallejo, the location of one of Solano County's courthouses," and that the

---

[7] The state appellate court's citation to *People v. Scott*, 61 Cal. 4th 363 (2015), may indicate a slight, but ultimately immaterial, misstatement of the applicable legal standard.  *Scott* allows "clearly establishe[d] nondiscriminatory reasons for excusing" a juror to "dispel" an inference of discrimination.  *Scott*, 61 Cal. 4th at 385.  Courts need to be careful not to elide the first and third *Batson* steps.  A reviewing court cannot rely on the existence of legitimate race-neutral reasons for the challenge to defeat a prima facie showing, as that consideration is properly part of the third *Batson* step and not the first.  *Johnson v. Finn*, 665 F.3d 1063, 1071 (9th Cir. 2011) ("The existence of 'legitimate race-neutral reasons' for a peremptory strike . . . cannot negate the existence of a prima facie showing in the first instance, or else the Supreme Court's repeated guidance about the minimal burden of such a showing would be rendered meaningless.").  *See also Williams v. Runnels*, 432 F.3d 1102, 1110 (9th Cir. 2006) ("refutation of the inference requires more than a determination that the record could have supported race-neutral reasons for the prosecutor's use of his peremptory challenges on prospective African-American jurors").  To the extent the state appellate court relied on *Scott*, it therefore may have applied the wrong standard.  But because petitioner failed in the first instance to raise an inference that triggered the need for refutation by the existence of possible race-neutral reasons, any error was harmless.

prosecution's using it as justification to exclude her from the jury was "trivial and pretextual." *Id.* at 10.  She also notes that the prosecution did not ask the juror what "VJO" referred to, any additional questions about her prior jury service, or any additional questions about her children. *Id.* at 10-11.  Petitioner argues that the trial court's assessment of the proffered reasons was flawed.  *Id.* at 11.  But because she did not raise an inference of discrimination at the first step, the state appellate court was not required to evaluate the proffered reasons, and this Court is not either.

There is no Supreme Court precedent clearly establishing that circumstances like the ones in petitioner's case raise an inference of discrimination such that a prima facie case was made.  *See United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994) ("The one fact supporting Vasquez-Lopez's *Batson* claim was the juror's status as the sole Black prospective juror. More was required" to raise a step-one inference").  Habeas relief is therefore denied as to this claim.

**B.  Insufficient Evidence of First-Degree Murder**

Petitioner argues that she was denied due process because there was a "lack of substantial evidence of murder by torture; lack of substantial evidence of intent for torture with respect to injury that caused death; lack of substantial evidence of aiding and abetting injury that caused death;" and  "expert testimony that fatal injury would have eventually been painful, but no evidence victim acted as if in pain."  ECF No. 1 at 5.  The jury was instructed with CALCRIM 521 as follows:

> A defendant is guilty of first degree murder if the People have proved that the defendant murdered by torture. The defendant murdered by torture if:
>
> 1. He or she willfully, deliberately, and with premeditation intended to inflict extreme and prolonged pain on the person killed while that person was still alive;
>
> 2. He or she intended to inflict such pain on the person killed for the calculated purpose of revenge, extortion, persuasion, or any other sadistic reason;
>
> 3. The acts causing death involved a high degree of probability of death;
>
> AND
>
> 4. The torture was a cause of death.

> A person commits an act *willfully* when he or she does it willingly or on purpose. A person *deliberates* if he or she carefully weighs the considerations for and against his or her choice and, knowing the consequences, decides to act. An act is done with *premeditation* if the decision to commit the act is made before the act is done.
>
> There is no requirement that the person killed be aware of the pain.
>
> A finding of torture does not require that the defendant intended to kill.

ECF No. 8-4 at 198.

Petitioner argues that "[t]here is no evidence [she] inflicted any injury on Kayleigh for 'sadistic purpose'"; that the rupture of Kayleigh's small intestine would have been "very painful" and her "discomfort would have been apparent," which was inconsistent with Officer Wade's observations of her on January 29, which "did not describe her as actually manifesting obvious life threatening or even serious injury"; and that "the prosecution's evidence of torture consisted solely of repeated blunt force trauma causing 'extremely painful' injuries," which was not enough under California law to demonstrate intent to torture.  ECF No. 1 at 25.  Petitioner claims the neighbor Ms. Cisneros's testimony about hearing petitioner hit Kayleigh two weeks before her death, as the only evidence of petitioner personally striking Kayleigh, "is insufficient to infer a personal act of torture" because it is too remote in time, allows no inferences about the amount of force used, and does not match up with any forensics evidence.  *Id.* at 26.

### 1.  Federal Authority

In the federal habeas context, a court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

The Supreme Court has emphasized that "*Jackson* claims face a high bar in federal habeas proceedings."  *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam).  Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction.  *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995); *but see Kipp v. Davis*, 971 F.3d 939, 957, 958-59 (9th Cir. 2020) (granting writ where, after prior bad acts evidence was rejected, "the case . . . for [the instant] attempted rape and special circumstance of intent to kill during attempted rape

United States District Court
Northern District of California

1   was circumstantial"). Mere suspicion or speculation cannot support logical inferences, however.

2   *Walters*, 45 F.3d at 1358.

3       A federal habeas court applies the standards of *Jackson* with an additional layer of

4   deference. *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). Generally, a federal habeas

5   court must ask whether the operative state court decision reflected an unreasonable application of

6   *Jackson* to the facts of the case. *Coleman*, 566 U.S. at 651. To grant relief, therefore, a federal

7   habeas court must conclude that "the state court's determination that a rational jury could have

8   found that there was sufficient evidence of guilt, i.e., that each required element was proven

9   beyond a reasonable doubt, was objectively unreasonable." *Boyer v. Belleque*, 659 F.3d 957, 964-

10  965 (9th Cir. 2011).

### 2.  Appellate Court Decision

12      The state appellate court rejected this claim:

> A conviction for first degree murder under the theory that the murder
> was by torture requires proof of "(1) acts causing death that involve a
> high degree of probability of the victim's death; and (2) a willful,
> deliberate, and premeditated intent to cause extreme pain or suffering
> for the purpose of revenge, extortion, persuasion, or another sadistic
> purpose." (*People v. Cook* (2006) 39 Cal.4th 566, 602.) "The intent
> to torture 'is a state of mind which, unless established by *the
> defendant's own statements* (or by another witness's description of a
> defendant's behavior in committing the offenses), must be proved by
> the *circumstances surrounding the commission of the
> offense* [citations], which include the *nature and severity of the
> victim's wounds.*'" (*People v. Mungia* (2008) 44 Cal.4th 1101, 1137.)
> The severity of the wounds must not be given undue weight, because
> "severe injuries may also be consistent with the desire to kill, the heat
> of passion, or an explosion of violence." (*Ibid.*)
>
> Krueger concedes that there is substantial evidence that Kayleigh's
> death was by one or more blows to the abdomen, and that the injuries
> that caused her death would have caused extreme prolonged pain. She
> argues there is no evidence that she inflicted Kayleigh's fatal injuries
> or aided Warner in inflicting them, and no evidence that she intended
> to cause extreme pain for a sadistic purpose or that, as an aider and
> abettor, she shared Warner's intent, which would have occurred if she
> had " ' "know[n] the full extent of [his] criminal purpose and give[n]
> aid or encouragement with the intent or purpose of facilitating [his]
> commission of the crime." ' "[22]
>
> > 22. The jury was instructed, "Someone *aids and
> > abets* a crime if he or she knows of the perpetrator's
> > unlawful purpose and he or she specifically intends
> > to, and does in fact, aid, facilitate, promote,

encourage, or instigate the perpetrator's commission of that crime." The jury was also instructed that the aid can be provided by "[t]he defendant's words or conduct, or failure to act in those situations where the defendant was under a legal duty to act."

(*People v. McCoy* (2001) 25 Cal.4th 1111, 1118.) More specifically, she contends there is no evidence of the circumstances under which Kayleigh suffered the fatal injuries, and that absent such evidence, "the mere fact she suffered painful injuries" does not prove the intent required for a conviction for first degree murder.

Reviewing the record in the light most favorable to the judgment, we conclude there is ample evidence of the circumstances under which Kayleigh suffered the injuries to support the verdict against Krueger, including evidence of deliberate and premeditated intent to cause extreme pain for a sadistic purpose.

The medical experts agreed that the fatal injury or injuries occurred between the police visits to Krueger's apartment on January 27 and 29. During that time, the only people who had access to Kayleigh were Krueger, Warner, Epperson and the friend Krueger visited on January 27 after the police visit, and there is no evidence or suggestion that Epperson or the other friend laid a hand on her. That leaves Warner and Krueger, who were in Krueger's 585-square-foot apartment for most of that time with no one present but Kayleigh. The jury could have inferred that the injuries were inflicted by Warner, or Krueger, or both of them. As to Warner, evidence that in the weeks before Kayleigh's death he had thrown over a Christmas tree, slammed Krueger's hand in a door, pushed Krueger against a door, punched holes in a door, and spanked Kayleigh so hard he left marks on her supports an inference that he struck the fatal blow. As to Krueger, there was evidence that she had a temper, had directed violence at Jason, became angry when coming down from a methamphetamine high, and hit Kayleigh on at least one occasion during the two weeks before her death, notwithstanding her claim that she had never hit her except for three or four spankings with an open hand that had occurred long ago.[23]

> 23. The jury could well have doubted Krueger's credibility on a number of issues. Among other things, there was evidence that she gave different accounts of her injuries and Kayleigh's to different people, and that she had lied to CPS in connection with their supervision of Kayleigh.

If the fatal injuries were inflicted by Warner, the jury could have inferred that Krueger not only knew about them, but also assisted Warner in inflicting them or approved of his actions. The injuries required "severe" force, which would no doubt have provoked an audible reaction from Kayleigh even if the force itself could not be heard. The juries could have inferred that any sound would be heard within the apartment, which was only 585 square feet. Further, there was ample evidence that noises in the apartment carried to neighboring units, which supports the inference that noises would be heard within the apartment as well. Yet there is no evidence that

Krueger did anything to protect Kayleigh or interfere with Warner. The jury could have inferred, therefore, that Krueger approved of, encouraged, or assisted Warner's acts.

Krueger claims that the prosecution's evidence of torture consisted "solely of repeated blunt force trauma causing 'extremely painful' injuries." Not so. Kayleigh's small body – she was just 41 inches tall and weighed only 34 pounds—was covered with 41 bruises. There was vivid evidence of prolonged deterioration of Kayleigh's health, including abuse and attempts by Krueger to conceal it, suggesting a deliberate and premeditated intent to cause severe pain to Kayleigh. Some of the bruises that covered Kayleigh's body were caused by a beating or beatings that occurred within days or hours of her death. But those recent injuries were not the only injuries she had suffered. Some of the injuries on her body, including the broken rib, had occurred longer ago, and there is evidence from family members and neighbors that Kayleigh had exhibited a number of bruises in the weeks before her death and that Krueger and Warner gave conflicting accounts of them. Dr. Crawford-Jakubiak testified her injuries, the result of repeated episodes of blunt-force trauma, were "far beyond" what would commonly be suffered by a three-and-a-half-year-old, despite a litany of repeated excuses, like falling off a bike, bumping a head on the table, tripping over a clothes hamper, hitting a chin on a bathtub, or an overly energetic embrace while Kayleigh was sitting on a toilet seat. Toward the end of her life Kayleigh also exhibited an unusually subdued demeanor. Kayleigh played outside less often, and when she did, she was often alone. In the last month of her life, Kayleigh indicated to at least three different people that she did not want even to be at Krueger's apartment. There was a search on Krueger's cell phone for an article about a woman accused of child abuse.

There was evidence of premeditated and deliberate intent to cause extreme pain in Krueger's failing to seek any medical attention for Kayleigh at any time in the last weeks of her life, not to mention the last few days of her life, despite knowing there were bruises on her body and that she was in pain. This was a dramatic change from Krueger's previous practice of seeking care for Kayleigh for even minor problems. Krueger did not seek medical help despite abundant evidence that Kayleigh had become pale, was looking tired, and was vomiting. To the contrary, Krueger lied about what was wrong with Kayleigh and lied about seeking help when she told Robin that Kayleigh was ill and that she had contacted the doctor, when she told her father in late January that Kayleigh had the flu, when she led Epperson to believe she had called poison control, and when she told the police during their January 29 welfare check that Kayleigh had the flu.

More specifically, the jury could infer that Krueger was aware of bruising on Kayleigh from the online searches for information on how to get rid of bruises during the last week of Kayleigh's life. Accordingly, the jury could well have disbelieved Krueger's testimony that she was unaware of extensive bruising on Kayleigh's body on January 29 when they were in the shower together and on January 30 when she found the body. And the jury could infer that Krueger was aware that Kayleigh was in pain, because even though

Kayleigh was just three-and-a-half when she died, she was fully able to communicate how she felt, as shown by her interactions with Krueger, Robin, Epperson, and Officer Chambers. There was evidence from Dr. Crawford-Jakubiak that Kayleigh would have demonstrated pain from her broken rib and fatal injuries and would have communicated what happened to her, and jurors could infer that Kayleigh did indeed communicate about it, and that the computer search for "stabbing pain next to bellybutton" was conducted in response to a complaint from Kayleigh. Further, Krueger took steps to prevent Kayleigh from communicating with family members during the last weeks of her life by isolating her and preventing her from visiting with them.

There was evidence of premeditated and deliberate intent to cause extreme pain in the sheer number of bruises that covered Kayleigh's small body: 41 separate external injuries, of which 8 to 15 were on her abdomen. Dr. Cohen and Dr. Crawford-Jakubiak testified that bruising, which resulted from moderate to severe force, was consistent with beating, not with accidental injury or spanking; indeed, Krueger concedes that there is substantial evidence that Kayleigh's death was the result of an assault to her abdomen.

Krueger's conduct after Kayleigh's death provides further evidence that she had acted with premeditated and deliberate intent and that she and Warner acted with shared intent. Krueger did not appear to be in any distress in video footage taken after Kayleigh's death. She did not contact the police or any family members to seek assistance after Kayleigh died. She did, however, check on her benefits, go out for a walk with Warner to buy ice cream, and conduct a search for high-population U.S. cities, suggesting she was looking for a place to hide. She accompanied Warner when he asked his friends for help getting away and getting rid of Kayleigh's body. Despite the friends' insistence that they call the police, Krueger failed to do so and instead tried to flee with Warner. And the flight was not precipitous: Krueger testified that she found Kayleigh's body on the afternoon of January 30, but did not flee until the morning of February 1. She took the time to pack a bag of Kayleigh's clothes for her mother, and the jury could have inferred that she acted with Warner to conceal evidence, as reflected in the latex gloves found in the apartment and the fact that she and Warner left the apartment with a bag that was never found. While Krueger and Warner were away from the apartment, they took BART to San Francisco, where they went to a fast food restaurant and then to the beach; later they cuddled on an airport tram.

We agree with the Attorney General that a reasonable juror could have concluded that as Krueger and Warner increased their use of methamphetamine, they found Kayleigh to be an annoyance and obstacle to their drug use. Once Krueger reconnected with Warner in the summer of 2013, she became less attentive to Kayleigh. Eventually, Krueger and Warner were screaming at her to be quiet, as heard by a neighbor. In light of Kayleigh's injuries and Krueger's and Warner's conduct, the jury could conclude that they took to beating her with premeditated and deliberate intent to cause pain for the sadistic purpose of persuading the toddler to simply be quiet and leave them alone, escalating their assaults over time to achieve their aim when screaming at her or leaving her alone in a room with a movie

1       was not enough. Krueger's actions support the conclusion that she knew of the abuse and suffering she and Warner inflicted on Kayleigh, recognized that she bore blame for that abuse, and acted in concert with Warner and with the same intent.

3       In sum, the record contains substantial evidence to support the finding that Krueger acted with a torturous intent. There was evidence that severe force was used to inflict the fatal injury or injuries, evidence that Kayleigh had been injured extensively over a period of time, evidence that Kayleigh was in severe distress, and evidence that not only was her distress known to Krueger and ignored, but also Krueger kept Kayleigh away from people who might have been able to help her.

8 *Krueger*, 2021 WL 194189 at *23–26.

9           **3.   Analysis**

10       The state appellate court decision does not reflect an unreasonable application of *Jackson*.

11 The state appellate court reasonably determined that a rational jury could find sufficient evidence

12 of all the elements of the crime: that petitioner committed or aided Warner in committing acts that

13 involved a high likelihood of causing Kayleigh's death and did cause Kayleigh's death, and that

14 petitioner's conduct was willful, deliberate, and premeditated with intent to cause pain or suffering

15 for a sadistic purpose.  Although there may not have been direct evidence of "who struck

16 Kayleigh, when she was struck and in what manner," ECF No. 9-36 at 105-06, there was copious

17 circumstantial evidence allowing the inference that it was Warner or petitioner who did so and that

18 it was with enough force to cause the intestinal rupture from which she died.  Habeas relief is

19 therefore denied as to this claim.

20        **C.  Insufficient Evidence of Fatal Child Assault**

21       Petitioner argues that there was a "lack of substantial evidence of fatal child assault" and

22 "lack of substantial evidence of aiding and abetting infliction of injury that caused death."  ECF

23 No. 1 at 5.

24           **1.   Appellate Court Decision**

25       The state appellate court rejected this claim:

26       A conviction for assault on a child resulting in death requires proof that (1) a person, having the care or custody of a child under the age of eight, (2) assaults the child, (3) by means of force that to a reasonable person would be likely to produce great bodily injury, and (4) resulting in the child's death. (§ 273ab, subd. (a); *People v.*

*Malfavon* (2002) 102 Cal.App.4th 727, 735.)

> Krueger concedes there is substantial evidence that Kayleigh's death was the result of an assault, specifically blows to her abdomen, but argues that the evidence is insufficient to support a finding that she personally assaulted Kayleigh or that she knowingly aided Warner in doing so. She suggests her conviction for fatal assault rests solely on her presence and opportunity before Kayleigh's death and her flight after Kayleigh's death, and argues that "mere opportunity" will not sustain the verdict, and that evidence of flight does not suffice to prove guilt.

> We disagree with Krueger's characterization of the evidence. As we have discussed, the record shows more than "mere opportunity" and flight. Krueger's characterization disregards the evidence of her activities after Kayleigh's death, which go beyond flight, and which suggest consciousness of guilt and shared intent with Warner. Krueger did not immediately flee. She refused to call the police. She went out with Warner to get ice cream, tried to dispose of evidence, packed a bag of Kayleigh's clothes for her mother, negotiated a ride for herself and Warner to the bus station, accompanied Warner to the beach, and then laughed and snuggled with him on an airport tram. As we have discussed, although the evidence does not prove whether Krueger or Warner, or both of them, struck the fatal blow or blows to Kayleigh's abdomen, there is substantial evidence to support the finding that Krueger either struck the blow herself or aided and abetted Warner in the assault.

*Krueger*, 2021 WL 194189 at *27–28.

### 2. Analysis

Here too, the state appellate court did not apply *Jackson* unreasonably. The court reasonably determined that a rational jury could find sufficient evidence that petitioner either struck Kayleigh with the blows that were ultimately fatal, or aided and abetted Warner in doing so. Although there was no direct evidence of whether Warner or petitioner "did in fact assault Kayleigh between January 27 and January 29 in a manner that resulted in the blunt force trauma from which she died," or any direct evidence of whether, if Warner had done so, petitioner was aware of it, *see* ECF No. 9-36 at 110-11, there was plenty of circumstantial evidence from which the jury could draw those inferences. And "[e]ach of the inferences . . . is reasonable because it is 'supported by a chain of logic,' which is all that is required to distinguish reasonable inference from speculation." *United States v. Begay*, 673 F.3d 1038, 1045 (9th Cir. 2011). The evidence was constitutionally sufficient and habeas relief is therefore denied as to this claim.

United States District Court
Northern District of California

United States District Court
Northern District of California

### D.  Erroneous Admission of Trial Evidence

Petitioner argues that she was denied due process because the trial court permitted admission of the prosecution's "'demonstration' of putting a Kayleigh-sized mannequin into the freezer compartment of petitioner's refrigerator before the jury."  ECF No. 1 at 27.[8]

#### 1.  Federal Authority

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process.  *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir.), *cert. denied*, 479 U.S. 839 (1986). The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established Supreme Court precedent under § 2254(d)); *see, e,g,, Zapien v. Davis*, 849 F.3d 787, 794 (9th Cir. 2016) (because there is no Supreme Court case establishing the fundamental unfairness of admitting multiple hearsay testimony, *Holley* bars any such claim on federal habeas review).

Admission of evidence may violate due process where it is arbitrary or so prejudicial that it rendered the trial fundamentally unfair.  *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995); *Colley*, 784 F.2d at 990.  "Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process." *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991).

#### 2.  Appellate Court Decision

The state appellate court rejected this claim, finding that admission of the demonstration was erroneous but non-prejudicial.  It began with additional background:

---

[8] The Court notes that respondent failed to address this claim in the memorandum of points and authorities in support of the answer.  *See generally* ECF No. 7-1.

Krueger moved in limine to prevent the prosecution's planned demonstration that a mannequin the size of Kayleigh could fit in the freezer compartment of Krueger's refrigerator.

The prosecutor argued that the demonstration was relevant to the intent to inflict extreme pain and the intent to kill, and that the treatment of Kayleigh after she died "gives a pretty good indication of the intent while she was still alive." In addition, the prosecutor claimed it was "pertinent to the jury instruction on hiding or detracting from the evidence, which I believe this was in this case," and to show that it was physically possible to place a figure Kayleigh's size in the freezer. In particular, the prosecutor noted that Detective Hess had inferred that it was difficult to place the body in the freezer, but "[i]n actuality the mannequin fits quite easily in the freezer compartment." The prosecutor also argued that if the defense pathologist suggested that any of the bruises could have been caused by the act of putting her in the freezer, it would be important "to show that and to have the [prosecution] pathologist comment on that issue."

The defense argued that the prosecution could accomplish its stated purposes with photographs and witness testimony. The demonstration, according to the defense, would "unfairly focus[ ] ... attention on a bizarre aspect of the case that suggests, impermissibly, that the defendants are deranged and callous"; its purpose was "to inflame the jury against" Krueger; and it would "infect the proceedings with prejudice."

The trial court denied the motion in limine, commenting that it had reviewed the law on Evidence Code section 352 and considered both the probative value of the evidence and how it could be prejudicial. The court concluded, "I understand the Defense's position, but this is probative." The court stated it would allow the demonstration if it was "limited to a very short time of 10, 15 minutes."

The demonstration was carried out during Dr. Cohen's testimony. After he testified about the atypical pattern of lividity, which suggested that the body had been moved after death, and the injuries to the body, a mannequin the same length as Kayleigh was folded and placed in the freezer compartment of Krueger's refrigerator. The prosecutor qualified his questions to Dr. Cohen by asking him not to "assum[e] that this is the exact way that Kayleigh's body was put into a freezer," and asked whether any of the marks or injuries were the result of Kayleigh's placement in the freezer after death. Dr. Cohen testified that none of the injuries were caused by the placement after death, but that "livor mortis would be influenced by the specific position of the body and the changing, potential changing positions of the body after death."

Defense counsel then moved for a mistrial, contending that the demonstration was unnecessary, proved nothing, and served only "to inflame the passion of the jury." The trial court denied the motion, stating, "I'll note for the record that we have dealt with this issue previously. The refrigerator was requested to be brought in by the Prosecution to show the jury, it is the best evidence. I know you've requested it just be shown by way of a picture. They are entitled to

1

2

> show what actually happened or is alleged to have happened and it's up to the jury to give that the weight they feel appropriate. So the mistrial is denied."

3    *Krueger*, 2021 WL 194189 at *28–29.  The state appellate court then explained why it agreed with

4    petitioner that the admission was erroneous:

5

6

7

8

9

10

11

12

> We agree with Krueger that the trial court abused its discretion in allowing the demonstration. Although the trial court could reasonably conclude that the demonstration was a reasonable representation of what it was meant to portray (a mannequin the size of Kayleigh's body fit easily in the freezer, even if there was no evidence of exactly how Kayleigh's body was folded), the probative value of the demonstration was minimal. Krueger admitted that Kayleigh's body had been moved from the position in which it was found, and that Kayleigh's legs were folded and her body was placed in a plastic garbage bag and then a suitcase, which then went into the freezer. And even though the demonstration might have been probative of Dr. Cohen's testimony that none of Kayleigh's injuries occurred after her death, as the Attorney General suggests, there was no suggestion, let alone evidence, to the contrary.

13

14

15

16

17

18

19

20

> We disagree with the trial court's implicit determination that the demonstration was not unduly prejudicial. The demonstration was undoubtedly inflammatory, even though Krueger's admission that Kayleigh's body was placed in the freezer undercut its prejudicial impact. Krueger argues that the demonstration here is at least as prejudicial as the demonstration in *Rivera*, where our colleagues in Division One considered a demonstration in which an adult defendant strangled an adult-sized mannequin on the witness stand to show how a murder was committed. (*Rivera*, *supra*, 201 Cal.App.at pp. 364-365.) The panel in *Rivera* found that "a demonstration of the murder by defendant in court, before the jury, was inflammatory," and that its prejudicial effect, "while not great, exceeded its comparatively inconsequential probative value." (*Id.* at p. 365.) We likewise conclude that in the circumstances here, the prejudicial effect of the demonstration exceeds its minimal probative value.

21    *Id.* at *29.  But the court went on to determine that the error was harmless:

22

23

24

25

26

27

28

> We also conclude, however, that it is not reasonably probable that Krueger would have obtained a more favorable result in the absence of the demonstration, and therefore the error was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) In view of Krueger's admission that the body was put in the freezer and the extensive and uncontradicted evidence that Kayleigh was severely beaten, that her body suffered numerous injuries, and that she suffered great pain, and in view of the substantial evidence that Krueger inflicted those injuries or aided and abetted Warner in inflicting them, there is not a reasonable probability that the omission of the demonstration would have led to a more favorable verdict for Krueger with respect to the verdicts for first degree torture murder and assault resulting in the death of a child.[27]

47

27. Because we are reversing the jury's special circumstance finding for insufficiency of the evidence, we do not reach the question whether omission of the demonstration would have led to a more favorable verdict for Krueger as to the special circumstance.

(*Id.* at p. 836.) In that respect, too, this case is like *Rivera*, where the Court of Appeal concluded that the demonstration, which was "a visual repetition of defendant's testimony" and "cumulative," was ultimately harmless. (*Rivera*, *supra*, 201 Cal.4th at p. 366.)

*Id.* at *30. The state appellate court analyzed the mistrial motion separately:

Krueger argues that the trial court abused its discretion by basing its denial of the mistrial motion on a "mistaken factual finding that the demonstration showed 'what actually happened.' " According to Krueger, the trial court was mistaken because it disregarded the fact that the prosecution prefaced its question to Dr. Cohen by asking him not to assume that the demonstration was "the exact way Kayleigh's body was put into a freezer."

This argument is meritless. What "actually happened" is that Kayleigh's body was put into a freezer, as Krueger had told Detective Hess shortly after her arrest, and as Krueger testified at trial. Specifically, Krueger told Detective Hess that Kayleigh's body was folded, put in a bag, and put into the freezer, and the point of the demonstration was, in part, to show that Kayleigh's folded body would fit easily into the freezer in Krueger's apartment without further damaging the body. It was error to admit the demonstration, because there was no dispute that the body fit in the freezer and that Kayleigh's injuries occurred before she died. But the demonstration was a reasonable representation of what it was alleged to portray: a demonstration or reenactment need not be exact in all respects. (See *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1113-1115.)

In sum, Krueger fails to show that she was harmed by the trial court's denial of her motion in limine or that the trial court erred in denying her motion for mistrial. Accordingly, we reject Krueger's argument that we must reverse the judgment and remand for a new trial.

*Id.*

### 3.   Analysis

Because the state appellate court agreed with petitioner that admission of the evidence was erroneous, this Court need only analyze whether the error was harmless. In order to grant relief, this Court would have to determine both that the error had a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993), and that the state appellate court's harmlessness analysis was contrary to or involved an unreasonable

1    application of Supreme Court precedent under 28 U.S.C. § 2254(d)(1).  *See Brown v. Davenport*,

2    142 S. Ct. 1510, 1525 (2022).  The Court must deny relief if it finds that petitioner fails under

3    either the *Brecht* or the AEDPA standard.  *Id.* at 1524.

4         It is not likely that the error had a substantial effect on the jury.  *See Brecht*, 507 U.S. at

5    623.  Although it is likely that the demonstration may have caused the jury to view petitioner in a

6    worse light, the evidence against her was such that the jury almost certainly would have convicted

7    her of murder by torture and fatal child assault regardless.  There was abundant evidence of all the

8    elements of the crimes of conviction.[9]  Petitioner herself testified that Kayleigh's body was put in

9    the freezer, so the demonstration was a visual representation of a fact that was otherwise already in

10   evidence.  The prosecutor referred in closing to the fact that Kayleigh's body was put in the

11   freezer, *see* ECF No. 9-29 at 95, 101-102, but not to the demonstration specifically.  There was

12   evidence that Kayleigh was beaten badly over a long period of time, ultimately causing her death,

13   and that this occurred in petitioner's home while petitioner was present.  There was ample

14   evidence from which the jury could reasonably conclude that petitioner had the required intent.

15   The jury reached its verdict in petitioner's case in a single day, *see* ECF No. 8-5 at 13-14, and the

16   only questions the jury asked related to the torture special circumstance, the conviction for which

17   was ultimately vacated, *id.* at 16-18.  The error was harmless, and habeas relief is therefore not

18   denied as to this claim.

19   **III.    Certificate of Appealability**

20        The federal rules governing habeas cases brought by state prisoners require a district court

21   that issues an order denying a habeas petition to either grant or deny therein a certificate of

22   appealability.  *See* Rules Governing § 2254 Case, Rule 11(a).

23        A judge shall grant a certificate of appealability "only if the applicant has made a

24   substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the

25   ─────────────────

26   [9] To the extent the demonstration could have provided the jury with the impermissible, but
     exclusive, evidence supporting the intent to kill required for the torture special circumstance, the
27   error nonetheless would not be prejudicial because the special circumstance was overturned by the
     state appellate court.  *See, e.g.*, *Hardnett v. Marshall*, 25 F.3d 875, 880 (9th Cir. 1994), *as*
28   *amended* (Aug. 26, 1994) (admission of challenged evidence not prejudicial because it only had
     bearing on an element necessary for charge of which jury did not convict).

United States District Court
Northern District of California

certificate must indicate which issues satisfy this standard. *Id.* § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Petitioner has not made such a showing, and, accordingly, a certificate of appealability is denied.

## CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED.**

Dated:    10/26/2022

HAYWOOD S. GILLIAM, JR.
United States District Judge